**Betty VAN HORN, Plaintiff,**

v.

**SPECIALIZED SUPPORT SERVICES, INC. and Fred Fridlington Defendants.**

No. 4:01–CV–90550.

United States District Court, S.D. Iowa, Central Division.

Jan. 29, 2003.

Paige E. Fiedler, Johnston, IA, for Plaintiff.

Ronald L. Anderson, Richard Howes, West Des Moines, IA, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

PRATT, District Judge.

Plaintiff, Betty Van Horn, brings this action against her former employer, Specialized Support Services ("SSS"), and Fred Fridlington, who was the Executive Director of SSS at all times relevant to this lawsuit, alleging violations of 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Iowa Civil Rights Act ("ICRA"). Iowa Code § 216.1 *et seq.* Plaintiff's claims rest on theories of sexual harassment and retaliation. A bench trial was held on January 13–15, 2003. The case is fully submitted and ripe for disposition.

## I. FINDINGS OF FACT

### A. The Parties

1. Defendant is a company with approximately 400 total employees throughout Iowa and Missouri. It provides services to mentally retarded and developmentally disabled clients, both in group settings and in the clients' homes. Defendant Fred Fridlington was the Executive Director of SSS from 1992 to 2002 and the owner of twenty-five percent of the company. The other owners were not involved in the day-to-day operations of the business during the period of time involved in this case.

2. Betty Van Horn began working for SSS on January 10, 2000. She was hired as a member of the support staff to provide direct care services for clients. Direct care services involved teaching living skills to the clients of SSS, including teaching cooking, shopping, housekeeping, and safety, and role-modeling responsible behaviors.

3. Ms. Van Horn was experienced in performing this type of work. She had been employed in the human services field since 1989. At the time she was employed by SSS, she was also working for Southwest Iowa Residential Facilities ("SIRF"), where she had been employed since 1991. Both of these jobs entailed working with mentally impaired individuals. At SIRF, she worked with the mentally handicapped and performed substantially the same functions as she did at SSS.

4. Ms. Van Horn was a reliable and dedicated employee of SSS. She performed her duties responsibly and completely. Until Ms. Van Horn's last day of employment on November 6, 2000, SSS had not experienced any problems with her and had found her to be a satisfactory employee.

5. Ms. Van Horn's direct supervisor at SSS was Sandee Brownrigg. Ms. Brownrigg also provided direct care services to KB, Ms. Van Horn's client. Michele Crawford was Ms. Brownrigg's supervisor and the Program Coordinator; she ran the office, wrote programs for individual clients, and coordinated services for the clients with staff. Ms. Crawford, in turn, was supervised by Derek Laney who was the Executive Director of SSS. Mr. Laney's duties included running the daily operations of SSS, supervising the coordinators, and maintaining the budget. Mr. Laney reported to Mr. Fridlington.

### B. Relevant Company Policies

6. Employees at SSS had various ways to communicate among themselves as well as with the members of management. Staff meetings were held once a month.

7. The direct care staff members were also required to fill out daily summaries (DS) for every shift that the person worked. These DS were kept in a notebook at the "waiver home," where KB lived. The DS were a way for the direct care workers to communicate with each other and the supervisors about what had occurred during a shift. Ms. Brownrigg read the summaries that covered the shift proceeding her shift each day that she was scheduled to work. Once a month, Ms. Brownrigg took the DS to the SSS office. Ms. Crawford was required to read the DS every month as part of her job.

8. Staff members could also complete incident reports to detail unusual events of concern that had taken place during their shift.

9. As recently as 2002, SSS had no sexual harassment policy. SSS did not provide its employees with any training concerning the prevention or handling of sexual harassment. Management level employees were not trained on how to

recognize a sexual harassment claim, or on how to respond to a sexual harassment complaint. The company had no policy on retaliation.

10. Fred Fridlington testified that he was not aware that their clients were capable of behavior that could legally constitute sexual harassment of an employee. He believed that SSS employees could expect to experience inappropriate comments and touching, including touching of private body parts by clients or being sexually propositioned, as part of the "risk" of working with the developmentally disabled.

11. SSS had a Team Handbook that was revised on August 10, 2000, after Ms. Van Horn had been working for SSS for several months At the beginning of her employment with SSS, Ms. Van Horn signed a receipt for a Team Handbook that she never received. She instead received a notebook containing time sheets, blank daily summary sheets, and her schedule. She also received a copy of SSS's Code of Ethics. The Code of Ethics contains a heading entitled "Respect Every Consumer's [1] Rights," wherein it reads, "Never impose punishments."

### C. Ms. Van Horn's Early Work History with KB

12. Through SSS, Ms. Van Horn began working with a client named KB in June of 2000. KB was a twenty-one year old man with Down's Syndrome. He lived in his parents' home when Ms. Van Horn began working with him.

13. Ms. Van Horn spent approximately an hour with KB each morning as he got ready for the day. Initially, Ms. Van Horn simply observed as KB's mother, Paula, assisted KB in getting up, dressing, preparing and eating breakfast, and completing his morning hygiene routine. Ms. Van Horn observed the different techniques Paula used with KB to motivate him and to keep him on task. One such technique was used when KB was sitting down and Paula wanted him to stand. This technique involved extending her arms towards KB, taking his hands, and saying, "We need to get up. Don't hurt my back."

14. To get KB accustomed to Ms. Van Horn, Paula slowly distanced herself from helping KB in the mornings and Ms. Van Horn took over an increasing share of the duties involved in KB's morning routine. Ms. Van Horn employed a version of the arm extension technique she had observed Paula use. Ms. Van Horn would extend her arms towards KB and say, "Hands please," and grasp KB's hands. Paula had witnessed Ms. Van Horn using this technique and testified that she believed the contact to be appropriate.

15. In September of 2000, KB moved out of his parents' home and into the "waiver home." The waiver home is a house that KB's parents had purchased and set up as an assisted living residence for KB and two other residents. At the time relevant to this lawsuit, KB lived at the waiver house with one roommate, a mentally disabled young woman.

16. KB required more intensive services from SSS following the move away from his parents. Accordingly, whenever KB or his roommate were at home, a worker from SSS was at the waiver home as well.

17. The transition to the waiver house from the home he had lived in with his parents was a difficult one for KB. Shortly following the move, KB began expressing his desire to leave the waiver home and to move back into his parents' home.

---

1. SSS refers to the clients to whom they provide services as "consumers."

18. Ms. Van Horn worked the night shift at the waiver home and also held another job during the day. On nights she was scheduled to work, Ms. Van Horn would arrive at the home at approximately 10:30 p.m. and leave around 8:30 a.m., after KB left for work. There was a sunroom on the main floor of the house where the support staff could sleep when KB and his roommate were sleeping.

### D. KB's Behavior Toward Ms. Van Horn and SSS' Response

19. While he was living in his parents' home, Ms. Van Horn did not observe KB display any behaviors she deemed to be sexually inappropriate. Shortly following the move, however, KB's behavior changed.

20. *October 19, 2000.* On October 19, 2000, Ms. Van Horn recorded in her DS a situation that occurred that night. KB and Ms. Van Horn had just finished watching a movie, and KB had indicated that he wanted to talk. KB began repeating himself and Ms. Van Horn suggested that he go to bed. He told Ms. Van Horn that he loved her and insisted she reciprocate. Ms. Van Horn refused and reminded him that she was a staff member working in his house. KB then lay down on the floor next to the air mattress upon which Ms. Van Horn slept. She informed KB that he could sleep on the couch in the living room or in his own bed upstairs, but that he could not sleep in her room. KB replied that this was his house and she reminded him that the sun room was her sleeping room.

21. No one from SSS ever discussed the incident with Ms. Van Horn or took any action after her report.

22. *October 20, 2000.* Ms. Van Horn's next shift began on October 20th. KB answered the door and wanted to help Ms. Van Horn set up her air mattress in the sunroom. He told the staff member whose shift was ending "Just leave, will you." Ms. Van Horn had never heard KB speak in that manner. While Ms. Van Horn was sitting on the couch, KB wanted to sit next to her. She told him he could sit on the same couch, but not next to her.

23. KB then kissed Ms. Van Horn on her cheek, in front of her ear. Ms. Van Horn responded by moving to a single chair and stated that the kiss on the check was inappropriate because she was a staff member, not his girlfriend or a family member. KB apologized and requested a hug.

24. Ms. Van Horn agreed, but when KB reached his arms out for a hug, he grabbed at and touched her breast. The contact was brief and caused Ms. Van Horn no physical pain. She backed away and refused further pleas for a hug. Ms. Van Horn told KB that she would not tolerate that type of behavior from him or any other male and suggested that he go to bed.

25. To distance herself from the situation, Ms. Van Horn went into the bathroom and shut the door, while KB stood outside yelling at her. He eventually calmed down, and she came out. Ms. Van Horn recounted all of this in her DS for the day.

26. Ms. Van Horn feared that KB's inappropriate behavior was intensifying and she was unsure of how to handle it. She notified Ms. Brownrigg of the incident. Ms. Brownrigg passed along the information concerning the incident to Ms. Crawford, and affirmed Ms. Van Horn's handling of the incident. Ms. Van Horn did not file a formal incident report after noting the incident in her DS.

27. Ms. Van Horn recounted the incident at a staff meeting and expressed her concern that KB's behavior was getting

worse. The staff and supervisors at the meeting offered no assistance or guidance to her. No action was taken by any employees of SSS. At the staff meeting, Ms. Van Horn also commented that if KB displayed these behaviors to a woman in public, he could get slapped. She was concerned that KB was not learning appropriate behaviors and might face repercussions if he displayed inappropriate behaviors in public.

28. *Consultation with Russ Moulton.*

a. Since the move to the waiver house, KB's employer, Innovative Industries, and KB's mother, Paula, became concerned about "oppositional" behaviors KB was exhibiting.[2] Innovative Industries contacted a psychologist, Russ Moulton, in June of 2000 for assistance with KB's behavior. Paula again contacted Mr. Moulton in October.

b. Mr. Moulton met with KB on October 20th, the day after the initial incident reported by Ms. Van Horn, and discussed with him the difficulties he was having getting up and going to work in the morning, as well as remaining at work once he had arrived. They also discussed KB's new living environment and his desire to move back to his parents' home.

c. Mr. Moulton had no training or experience in investigating or dealing with sexual harassment complaints. The purpose of his involvement with KB was to address KB's oppositional behavior, not to address concerns regarding inappropriate sexual behavior or comments. Mr. Moulton was not brought in at the initiative of SSS.

d. Mr. Moulton had some knowledge of the report Ms. Van Horn had made on October 19th.

e. Mr. Moulton received a fax from Ms. Crawford on October 24th, which stated that a female staff member had been struggling with KB wanting to sleep with her and touch her inappropriately. This fax was accompanied by several incident reports filed by Melissa Ross, another support staff member, and Ms. Brownrigg. These incident reports detailed situations in which KB had flooded the bathroom or broken or upset objects in his bedroom. None referred to KB touching staff members inappropriately.

29. *October 21, 2000.* Another support staff member, Deanne Jackson, recorded an incident in which KB inappropriately touched her on October 21, 2000. Ms. Jackson recorded in her DS entry that KB had just finished speaking to his mother on the phone. He then came over to Ms. Jackson and began "touching her too much." She told KB that the touching made her feel badly and asked him to stop. A new male support staff member spoke to KB briefly about the touching. No management-level employee responded to this event.

30. *October 25, 2000.* During her shift on October 25th, KB expressed to Ms. Van Horn that he could not sleep in a room on the main floor of the house because he did not have permission from the landlord. KB then stated that he wanted to sleep in the sun room with Ms. Van Horn. She suggested he go upstairs and sleep in his own room. KB relented and went upstairs.

31. None of Ms. Van Horn's supervisors commented on the incident, although

---

**2.** KB had become resistant to following directions and had exhibited behaviors such as refusing to get out of bed in the morning, delaying going to work, and hiding or leaving work once he was there. If he did not want to comply with a request to engage in an activity, such as go to work or take a shower, KB often sat down and refused to move.

she had recorded it in her DS. Ms. Brownrigg read about the incident in Ms. Van Horn's DS and did not deem a response warranted since KB had gone upstairs to bed. Ms. Brownrigg did not notify anyone else of the incident.

32. *October 27, 2000.* Shortly after Ms. Van Horn arrived at the waiver house on October 27th, KB repeatedly insisted that a part of his body touch Ms. Van Horn's. Ms. Van Horn was sitting in a chair talking to KB, when he put his legs on her lap. She responded by telling him "I don't think so" and physically pushing his legs down. KB said that he could put his legs up there. Ms. Van Horn told him that if he wanted his legs on the chair, she would move to the couch.

33. After she moved over to the couch, KB followed Ms. Van Horn and sat beside her. Then he turned and tried to lay on top of her. Ms. Van Horn struggled to get out from under KB and off the couch. His legs were tangled up with Ms. Van Horn's legs and she was pushed against the back of the couch. During the struggle, KB pinched Ms. Van Horn's inner thigh and began making an "ooooh" sound.

34. Ms. Van Horn turned her shoulder so that her back was to KB and crawled off the couch. Ms. Van Horn again sat in the chair. KB grunted and said "Well, Betty don't do this." He came over to the chair and put his arms around Ms. Van Horn's neck. She went into the sunroom and sat on a stool so there was no space for KB to sit beside her. After this, he left her alone for the rest of the night. Ms. Van Horn filled out an incident report and dropped it off at the SSS office. She also referenced the incident report in her DS.

35. Ms. Van Horn also included in her DS for that same night that KB had repeatedly told Ms. Van Horn that he loved her. After she responded to each declaration of love simply by saying that she liked him too, KB complained that she was not supposed to respond that way; she was supposed to respond that she loved him too. She explained that she was a staff member, and not his family or lover. KB eventually stopped and went upstairs.

36. Despite the record of the night in her daily summary and the incident report, no member of SSS discussed this incident with Ms. Van Horn or took any other action in response.

37. *October 28, 2000.* During her next shift on October 28th, Ms. Van Horn reported in her DS that KB wanted the lights turned off so that Ms. Van Horn could lay down on the bed. KB claimed that he wanted to lay on the floor beside Ms. Van Horn and talk. Ms. Van Horn sat on the couch, but then KB did not want to talk. She suggested that KB go to bed if he was tired. He replied that he would not go to bed until she did. Ms. Van Horn lay down on her air mattress and KB told her, "I love you." Ms. Van Horn replied that she liked him too. KB repeatedly insisted that Ms. Van Horn had to reciprocate, but Ms. Van Horn stopped talking. KB sat in a chair for fifteen minutes before going upstairs to his room.

38. Again, Ms. Van Horn received no response from SSS to this entry in her DS.

39. *Training Requests.* Ms. Van Horn asked Ms. Crawford and Ms. Brownrigg for self-defense training on many occasions to protect herself from KB's advances. Ms. Crawford indicated on these occasions that she would check if such training existed. When Ms. Van Horn followed up on these requests with Ms. Crawford, she was told that there was training for dealing with behavior such as hitting or pinching, but was nothing directly available for sexually aggressive behavior. Ms. Van Horn received no training of any type.

40. *October 29, 2000 Staff Meeting; Behavior Modification Plan.*

a. On October 29th, KB, KB's parents, Ms. Crawford, Ms.Brownrigg, Ms. Van Horn, Russ Moulton, and some of the other members of the direct care staff gathered at the waiver home. The purpose of this meeting was to discuss the problems the staff had been encountering with KB so that Mr. Moulton could develop a behavior management program to ensure everyone who took care of KB would react to him in a consistent manner.

b. Mr. Moulton encouraged those in attendance to discuss any problems they were experiencing with KB. He emphasized that staff were free to raise any issues. Ms. Van Horn related the instances of KB telling her he loved her, as well as the inappropriate touching. Mr. Moulton did not provide any feedback to Ms. Van Horn regarding the behavior she cited, and the focus of the meeting moved quickly away from the issues she had raised.

c. The major problem the staff as a whole related was KB's reluctance to comply with requests, particularly getting up in the morning. The meeting provided an opportunity for Mr. Moulton to gather suggestions and learn which approaches to include in the plan. Staff members discussed a three-step prompting sequence that they had been using with KB.

d. Following the meeting, Mr. Moulton finalized the Behavior Modification Plan for KB that had been outlined at the meeting. The plan did not address KB's sexual behavior since his escape-motivated behavior was the major issue presented to Mr. Moulton.[3]

e. Under the plan, the staff was instructed to use a three-step prompting sequence to get KB up in the mornings. If KB did not get up on his own, the plan mandated using an indirect prompt such as "What time do you get up?" This was to be followed by a direct prompt if KB was still in bed. An example of a direct prompt is, "It's time to get up." The third prompt in the sequence was a physical prompt, which would include the "Hands please," approach employed by Ms. Van Horn.

f. The plan was faxed to Ms. Crawford between October 29th and November 1st. It is not clear that the plan was ever made available to the direct care staff members. However, Ms. Van Horn was aware of the use of three-step prompting sequence that was detailed in plan at the October 29th meeting.

g. Ms. Crawford, KB's mother, and Mr. Moulton met to discuss the plan on November 1, 2000. As a result of the feedback provided in this meeting, Mr. Moulton developed a second behavior modification plan for KB. This second plan, however, was not implemented until after Ms. Van Horn was terminated. Thus, the staff relied on the three-step prompting sequence, including the physical prompt, throughout the time Ms. Van Horn was employed by SSS.[4]

3. Mr. Moulton explained at trial that escape-motivated behavior is behavior KB exhibited to avoid doing something that he did not want to do and was intended to prevent or decrease the likelihood that the person placing a demand on KB would continue. An example would be refusing to get out of bed in the morning so that he would not have to go to work.

4. The major difference between the first and second plans was that the physical prompt was removed from the prompting sequence. Thus, after implementation of the second plan, the procedure to follow when KB was not responding to a request was to use an indirect prompt followed by a direct prompt. If this sequence was not effective, the staff was instructed to terminate the interaction,

41. *November 1, 2000.* On November 1, 2000, Ms. Van Horn was working at the waiver home. She went upstairs when KB was brushing his teeth. Ms. Van Horn listened outside the door and heard KB giggling. He said "Betty wears pantyhose, I could take them off her, ooooh." KB then commented on whether his female roommate wore pantyhose as well or just panties and continued giggling.

42. Ms. Van Horn recorded this event in her DS for that day. Ms. Van Horn was fearful because she viewed KB's inappropriate behavior as progressing.

### E. November 6, 2000 Incident and Ms. Van Horn's Termination

43. *November 6, 2000.* Ms. Van Horn's final day of work with SSS was on November 6, 2000. KB was particularly slow moving that morning, and Ms. Van Horn worried she would be late for her other job, which was scheduled to begin at 10:00 a.m. Ms. Van Horn called Ms. Brownrigg and told her that KB was resistant to getting ready to leave and she needed to get to her other job. Ms. Brownrigg agreed to come over so that Ms. Van Horn could leave for work.

44. KB eventually got up, got dressed, and went downstairs. Ms. Van Horn was in the kitchen with KB's roommate. KB fixed his breakfast, ate, and then returned upstairs. Ms. Van Horn assumed he had gone upstairs to complete his morning hygiene routine. She finished getting KB's roommate ready for school and then went upstairs to check on KB.

45. When Ms. Van Horn entered KB's room, she found him sitting on his bed with his arms and legs crossed. Ms. Van Horn said "KB, you know we need to get moving here. You've got to get on the trolley, and you don't have your hygiene

done yet." He did not move. Ms. Van Horn walked out of the room to try to demonstrate to KB that she was getting ready to go, so he might as well get ready, too. The technique had worked with KB in the past, but was unsuccessful on this day.

46. Ms. Van Horn next tried the physical "Hands please," prompt. KB was sitting in the middle of the bed and Ms. Van Horn was standing at the edge of the bed facing him. She reached her hands straight out in front of her as she normally did with this prompt. KB giggled and reached his right hand out and pinched Ms. Van Horn's right breast, near the nipple.

47. In reaction to the pain, Ms. Van Horn instinctively slapped KB on the left side of his face. KB released his grip. Ms. Van Horn backed up and KB put his head down between his shoes. Ms. Van Horn told KB that the pinch was inappropriate behavior that had to stop. Ms. Van Horn left the room and went out into the hallway.

48. Ms. Brownrigg arrived at the waiver house shortly after Ms. Van Horn went into the hallway. Ms. Van Horn told Ms. Brownrigg what had happened and asked her what action to take. Ms. Van Horn stated that she realized she needed to fill out an incident report and Ms. Brownrigg agreed.

49. Ms. Van Horn went downstairs and filled out a report. While doing so, she requested Ms. Brownrigg's assistance to describe the physical contact that her hand had made with KB's face. Ms. Van Horn wanted to emphasize that the contact had been a reflex action and that it was not intentional. Ms. Brownrigg told her that the word she had written down, "slap," would be sufficient.

wait half an hour, and employ the two step prompting sequence again.

50. Upon completing the incident report, Ms. Van Horn took the report to the SSS office. She gave the report to Ms. Crawford. Ms. Van Horn left and Ms. Crawford called Derek Laney and reported the incident to him. Mr. Laney continued up the chain of command and called Mr. Fridlington. Mr. Laney informed Mr. Fridlington that Ms. Van Horn had slapped KB because he had grabbed her breast. Mr. Laney further indicated that he intended to terminate her employment. Mr. Fridlington replied that Mr. Laney should go ahead and fire Ms. Van Horn.

51. Ms. Van Horn went to see KB's mother, Paula, that morning and told her about the incident. Paula was not angry about the incident and even said that she would have reacted in the same way Ms. Van Horn did. Paula went over to the waiver house to see KB. She asked him what had happened, and his narration mirrored Ms. Van Horn's earlier account.

52. Paula did not see any kind of mark on KB's face and did not believe that any type of medical attention was warranted.

53. Ms. Van Horn arrived at the waiver house at 10:30 on the night of November 6th, to begin her shift as usual. Two staff members were present at the home, which was not standard procedure. The staff members told Ms. Van Horn that she needed to call Ms. Crawford at home. When Ms. Van Horn called Ms. Crawford, she was informed that SSS had reported Ms. Van Horn to the Iowa Department of Human Services (DHS) as part of a potential adult abuse situation. Ms. Crawford further said that Ms. Van Horn was suspended from work until DHS decided whether the report was well-founded or not.

54. Ms. Van Horn understood that SSS was considering terminating her employment. She met with Fred Fridlington on November 8th to discuss the incident. Ms. Van Horn demonstrated to Mr. Fridlington how she could cross her arms in front of her and then extend her hands out to assist clients to prevent similar events from occurring in the future.

55. Paula attended this meeting as well. She was very supportive of Ms. Van Horn and emphasized to Mr. Fridlington that Ms. Van Horn was an excellent, reliable employee. Paula did not want Ms. Van Horn fired and thought it was only fair that she be given another chance. She expressed her belief that the slap was justified under the circumstances.

56. Mr. Fridlington stated that slapping a mentally retarded person was never justified. Ms. Van Horn left the meeting with the understanding that someone would be in the SSS office at 4:00 that day to inform her of the status of her job. Ms. Van Horn twice attempted to reach the SSS office at the designated time, but no one answered. She then called Ms. Crawford at home. Ms. Crawford told Ms. Van Horn that she had been terminated according to company policy. Ms. Van Horn asked what the relevant company policy was and requested a copy. She later learned from Paula that the DHS report had come back unfounded.

57. On November 10, 2000, Ms. Van Horn received and signed an Employee Termination for Cause form provided by SSS. The form stated that Ms. Van Horn was fired for slapping a client after he grabbed her. This is consistent with the reason Ms. Van Horn was given at various times as to why her employment was terminated.

58. At the time she signed the form, Ms. Van Horn added at the bottom of the form that the client was hit in the face as a result of a human reflex. She also noted that she had requested a copy of the SSS policy that she was being fired in accor-

dance with and as of the date of signing, had still not received such a policy.

59. On November 21, Ms. Van Horn wrote to SSS, again requesting a copy of the relevant policy and a copy of any training she had received from SSS regarding prevention of inappropriate behavior. Ms. Van Horn spoke to Mr. Laney on the phone regarding the policy she had violated. Mr. Laney told her that there was no formal written policy.

60. Mr. Fridlington made the ultimate decision to terminate Ms. Van Horn's employment with SSS.

61. Before November 6, 2000, Mr. Laney was not aware of the reports Ms. Van Horn had written detailing KB's inappropriate comments and sexually inappropriate behavior. Mr. Laney had never spoken to Ms. Van Horn personally about any kind of sexual harassment or responses to such behavior. Similarly, before November 6th, Mr. Fridlington had no knowledge of Ms. Van Horn's complaints.

### F. Damages

62. Ms. Van Horn has held two full-time jobs since 1989. When she began working for SSS on January 10, 2000, she was also employed by Southwest Iowa Residential Facilities (SIRF).

63. As of November 2000, Ms. Van Horn earned $8.25 per hour from SSS. Ms. Van Horn testified that she began looking for a replacement job immediately after she was fired on November 6, 2000, as she needed money to make her house payments.

64. Ms. Van Horn was employed only at SIRF during the last six weeks of 2000 and through April of 2001; this period of partial employment includes three pay periods in 2000 and seven pay periods in 2001.

65. Ms. Van Horn never received unemployment benefits because the compensation from SIRF prevented her from being eligible.

66. If Ms. Van Horn had worked for SSS for the remainder of 2000 through April of 2001, she would have been entitled to paid holidays on Thanksgiving and Christmas of 2000 and Easter and New Year's Day during 2001, and to an additional forty hours of paid vacation time.

67. Prior to her employment at SSS, Ms. Van Horn had worked for six years at Lab Core in addition to her job at SIRF. After she was fired by SSS, she reapplied at Lab Core. Lab Core did not initially have a position for her, but she did secure a job with Lab Core in April of 2001.

68. Ms. Van Horn earns more per hour at Lab Core than at SSS; however, she now must commute 136 miles per day, round trip. At SSS, she worked only a few blocks from home. This commute takes approximately two hours and fifteen minutes total each day.

69. At Lab Core, Ms. Van Horn does not work with developmentally disabled individuals. Instead, she serves as a courier by picking up and delivering specimens and also works in the office. Ms. Van Horn would prefer a job working with the developmentally disabled to her current work with Lab Core.

70. Ms. Van Horn suffered emotional distress from the incidents with KB. These incidents brought up old feelings of shame and embarrassment from "other ordeals" she had experienced in the past. She testified that these "other ordeals" included the fact that she was raped as a child.

71. Ms. Van Horn felt worthless after the rape and then devastated and degraded. When KB began acting out in a sexually inappropriate manner, she began to experience the same feelings again and felt

that KB did not respect her. Although Ms. Van Horn did not tell anyone at SSS that the incidents were causing her to relive her old feelings surrounding her rape, she did report the incidents with KB.

72. Ms. Van Horn also experienced on-going frustration with the unresponsiveness of SSS to her complaints. She felt that the incidents with KB were serious and that no one listened to her or seemed to care as KB's inappropriate behavior progressed. Ms. Van Horn testified that she never got a direct answer from SSS, and it seemed like nobody else knew what to do or how to handle KB's progressive behavior.

73. Ms. Van Horn also experienced frustration because after her numerous requests for self-defense training to help protect her from KB's advances, she was not provided with any training and was told that SSS had no training to specifically deal with sexually aggressive behavior.

74. She felt frustration because she wanted to help KB, did not know how to help, and could not get anyone to listen to her concerns in this regard.

75. Ms. Van Horn also suffered emotional distress as a result of her firing. She testified that she cried when she was fired, because she had asked for help and did not receive any and then was fired because she defended herself. She feared she might lose her house which would be a devastating loss.

76. Even at the time of trial, she testified that she still experienced paranoia at her job at SIRF, fearing that if she dares to touch her patients, she could be fired. Ms. Van Horn refers to this paranoia as "an awful feeling." She works the night shift at SIRF so that she does not have to

deal with consumers as much and wants to work at a female-only facility.

77. Before the incidents at SSS, Ms. Van Horn considered herself a fairly pleasant and out-going person. Now she feels withdrawn and afraid to talk to people for fear of saying the wrong thing. She blames herself for the incidents at SSS and fears that she might "do the wrong thing" again.

78. Ms. Van Horn could not afford counseling to deal with these emotions and turned to her sponsor at a 12–step program.[5]

## II. CONCLUSIONS OF LAW

### A. Sexual Harassment Claim

█ Ms. Van Horn contends that the failure of SSS to adequately and promptly respond to her complaints regarding KB's behavior created a hostile work environment. Ms. Van Horn further alleges that this hostile work environment constituted sexual harassment in violation of both state and federal law prohibiting employment discrimination based on sex. *See* 42 U.S.C. § 2000e2(a)(1); Iowa Code Ann. § 216.6(1)(a). In order to prevail on her sexual harassment claim under a hostile work environment theory, Ms. Van Horn must show that (1) she is a member of a protected group; (2) she was subject to unwelcome sexual harassment (3) the harassment was based on sex (4) the harassment affected a term, condition, or privilege of employment; and (5) SSS knew or should have known of the harassment and failed to take appropriate remedial action. *Crist v. Focus Homes, Inc.,* 122 F.3d 1107, 1110 (8th Cir.1997).

Ms. Van Horn has satisfied the first three elements of a hostile work environment claim. It is undisputed that Ms. Van

---

5. The Court interprets Ms. Van Horn's testimony regarding the "12–step program" to refer to a program of Alcoholic's Anonymous, of which Ms. Van Horn is a member.

Horn is a female and thus protected under Title VII. With regard to the second element, the record clearly establishes that the conduct KB directed towards Ms. Van Horn constituted unwelcome sexual harassment. This Court also finds that the harassment was based on Ms. Van Horn's sex and, thus, satisfies the third element. "Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

■ However, the fourth requirement presents a more difficult question. Under a hostile work environment theory, sexual harassment is actionable if the harassing conduct is "sufficiently severe or pervasive 'to alter the conditions [of the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). The conduct must satisfy both an objective and subjective test: it must be sufficiently severe and pervasive to create a work environment which a reasonable person would view as hostile, and the victim must actually perceive the environment to be abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Notwithstanding the offensive nature of the conduct at issue here, the objective prong of the hostile environment test cannot be satisfied in this case.

■■ Whether an environment is objectively "hostile" or "abusive" requires a consideration of the totality of the circum-

stances. *Id.* at 23, 114 S.Ct. 367. Factors to consider in this assessment are "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

The Court finds that the client's behavior here cannot be viewed as sufficiently severe and pervasive to pass the "high threshold of actionable harm." *See Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir.2002). With regards to severity, many of the events were utterances and involved no physical contact. On three occasions, Ms. Van Horn was touched in an inappropriate sexual manner. In the final instance, which led to her termination, the client directly assaulted Ms. Van Horn by squeezing her breast. Had the prior instances of physical contact by the client been equally serious, the ongoing conduct might have been severe enough to render the work environment objectively hostile or abusive. However, while in no way minimizing the inappropriateness of the client's behavior or condoning the failure of SSS to take any corrective action, the November 6, 2000 incident is not alone, or together with the earlier conduct by the client, sufficiently severe enough to sustain a hostile work environment claim.

By way of comparison, in *Crist v. Focus Homes, Inc.*, the Eighth Circuit considered a factual context similar to the one presented in this case and found facts which could support a judgment against the employer under Title VII and state law on a hostile work environment theory. 122 F.3d 1107, 1111. There, employees at a residential program for developmentally disabled adults had been subjected to sexual harassment by a client, including thirteen reports over a two-month period that an individual named J.L. had grabbed a

staff member's breasts, buttocks, or genital areas. J.L. had also made frequent attempts to undress the staff and at least three attempts to digitally penetrate one of the plaintiffs. While a showing of equally egregious conduct may not be necessary in order for a plaintiff to pass Title VII's objective test, the harassment experienced by Ms. Van Horn did not rise to the level of the conduct exhibited by the disabled adult in *Crist*. The Court further notes that in *Crist*, the Eighth Circuit merely reiterated that the conduct was one of a number of factors the trier of fact should consider in a hostile work environment claim—neither the assaultive behavior of J.L. nor the inaction of the employer was, in the court's view, itself sufficient to establish a hostile work environment.[6]

In addition, the conduct Ms. Van Horn experienced took place over a period of less than one month, between October 19th and November 6th of 2000. The incidents at issue did not interfere with Ms. Van Horn's work performance, nor can they be viewed as sufficiently "pervasive", given the type of regular, direct, and personal care her employment setting involved. Ms. Van Horn is unable to make the required showing that the harassment affected a term, condition, or privilege of employment and cannot, therefore, sustain her sexual harassment claim.

As Ms. Van Horn fails to satisfy the fourth requirement of establishing a sexual harassment claim, the Court need not reach here the fifth requirement, that SSS knew what was occurring and failed to take prompt and effective remedial action. The Court reserves an analysis of SSS' responsibility for its discussion of the retaliation claim below.

## B. Retaliation Claim

■ Ms. Van Horn alleges that Defendants' actions in failing to protect her from sexual harassment and assaults and then firing her constitute sexual harassment and retaliation. Title VII prohibits an employer from discriminating or retaliating against an employee for engaging in "protected activity," which is either opposing an act of discrimination prohibited by Title VII (the "opposition clause") or participating in an investigation under Title VII (the "participation clause"). 42 U.S.C. § 2000e–3(a). *See Hunt v. Nebraska Public Power District*, 282 F.3d 1021, 1028 (8th Cir.2002). The Iowa Civil Rights Act contains similar protections. Iowa Code § 216.11 (2001)[7]. To establish a *prima facie* retaliation claim under Title VII, a plaintiff must show that (1) she engaged in protected activity, (2) that she suffered an adverse employment action, and (3) that the adverse action occurred because she was engaged in the protected activity. *Hunt*, 282 F.3d at 1028. Once the plaintiff has established a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a nondiscriminatory reason for the adverse employment action. *See id.* The plaintiff then bears the ultimate burden of showing that the defendant's prof-

---

6. Because of its procedural posture, *Crist* cannot be viewed as a benchmark for the level of conduct that could constitute actionable sexual harassment. In reversing summary judgment for the employer on the hostile work environment claim, the Eighth Circuit merely indicated that factual disputes remained as to the severity of the conduct and its effect on the appellants.

7. Iowa Code § 216.11(2) states as follows: "It shall be an unfair or discriminatory practice for any person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter."

fered justification was pretextual. *See id.* This test applies to both the federal discrimination claims under Title VII and those raised under the Iowa Civil Rights Act ("ICRA"). *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA"). *See also Kunzman v. Enron Corp.,* 902 F.Supp. 882 (N.D.Iowa 1995) (applying the same test to a retaliation claim under Iowa Code Chapter 216 and the ADEA).

 Opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2nd Cir.2000). An employee is privileged to oppose workplace discrimination both by the filing of formal charges and by informal action including "making informal complaints to management, writing critical letters to customers protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *See id.* (quoting *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2nd Cir.1990)). There is no question that Ms. Van Horn's repeated complaints to SSS about the conduct of her client constituted protected activity. However, Ms. Van Horn has not argued here that she was in fact terminated in retaliation for reporting her client's behavior. Rather, the "fighting issue" before the Court is whether Ms. Van Horn's slapping of her client in reaction to his squeezing her breast, is itself protected oppositional

activity. (Plaintiff's Trial Brief at 11). To be more precise, the Court must now resolve a question of first impression in this circuit—whether physical resistance to prohibited harassment may, in certain circumstances, constitute protected oppositional activity. At the outset, the Court finds it helpful to discuss two cases from other circuits which address this precise question in similar factual contexts.

The Ninth Circuit took up the issue in two related cases involving a rather colorful factual situation—a mime artist was fired by the Circus Circus casino for punching a casino patron who attempted to embrace her during a performance. The mime argued that her conduct was reasonable physical opposition to workplace harassment and was therefore "protected activity" under Title VII. In an unpublished opinion, the Ninth Circuit agreed that "reasonable defense against physical violence may be protected oppositional activity." *Folkerson v. Circus Circus Enterprises, Inc.,* 68 F.3d 480, 1995 WL 608432 (9th Cir.1995).[8] Finding the mime's reaction reasonable under the circumstances, the court reversed a grant of summary judgment for the employer. *Id.* Following remand, the case was again appealed to the Ninth Circuit. Although on the facts of the case the court found that Circus Circus was not liable for the harassing acts of its patron,[9] the court expressly held that an employer could be held liable for sexual harassment on the part of a private individual "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the

---

8. While not specifically referencing its reasoning on the protected activity question, the circuit relied on its conclusion in reaching its decision on remand. *See Folkerson v. Circus Circus Enterprises, Inc.,* 107 F.3d 754 (9th Cir.1997).

9. Because the casino had not ratified or acquiesced in its patron's actions but had taken steps to protect the mime from such encounters, the court concluded that her resistance was not in opposition to an unlawful employment practice of Circus Circus.

conduct." *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) (citations omitted).

In the second case, *Cruz v. Coach Stores, Inc.*, the Second Circuit considered a retaliation claim raised by an employee who was terminated after slapping a co-worker for making offensive, sexually charged comments to her. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2nd Cir.2000). Cruz alleged she had been terminated for defending herself from sexual harassment and argued that an act of self-defense against the harassing comments was protected activity under Title VII. The employer maintained that her conduct violated its rule against "any physical or verbal assault" at the workplace. Because the employee had other options for resisting the offensive behavior, the Second Circuit found plaintiff's slapping of her harasser was not protected activity. In so doing, however, the Second Circuit acknowledged the possibility that physical resistance "in opposition to Title VII-prohibited behavior might, in some circumstances, be protected under Title VII's retaliation provision." *Cruz*, 202 F.3d at 567. This Court believes that the circumstances of Ms. Van Horn's termination present just such a case.

 *Folkerson* and *Cruz* highlight the two issues which frame the Court's analysis of Ms. Van Horn's retaliation claim: 1) Was Ms. Van Horn's slapping her client "oppositional activity", and 2) If so, was it "protected activity" under Title VII. In order for her conduct to be protected under Title VII, it must first be in opposition

to an unlawful employment practice of the employer, not discrimination by a private individual.[10] *See Folkerson*, 107 F.3d at 756 (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978)). However, Title VII's protections are not limited to cases where the employer or its agent has itself harassed an employee. *See, e.g. Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (discussing cases of discrimination imputed to the employer); *Folkerson*, 107 F.3d 754; *Crist*, 122 F.3d 1107; *Cruz*, 202 F.3d 560. In *Crist*, the Eighth Circuit recognized that an employer could be liable for sexual harassment under Title VII for failing to respond to the harassment of its employees by developmentally disabled individuals under their care. 122 F.3d 1107. To hold otherwise, the court stated, would be to force employees to assume the risk of working with developmentally disabled individuals and relinquish their right to a safe working environment.[11] *Crist*, 122 F.3d at 1110. *See also Hall v. Gus Construction*, 842 F.2d 1010 (8th Cir.1988) (affirming judgment against an employer for failure to respond to harassment of plaintiffs by coworkers). The Court could not agree more. In the disparate treatment context, the Eighth Circuit has also held that "[w]hen an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination." *Excel v. Bosley*, 165 F.3d 635, 639 (8th Cir.1999) (citations omitted). The Court therefore

10. The employee's opposition is protected both when the employer's conduct is actually unlawful and when the employee demonstrates a good faith, reasonable belief that the conduct was unlawful. Because the Court finds SSS' conduct here actually unlawful, there is no need to address Ms. Van Horn's subjective belief.

11. Defendant Fred Fridlington's clearly shares the view of the defendant in *Crist*. He testified at trial that private body parts being touched is just "a risk of the business [of caring for the developmentally disabled]" and that the working environment was "as safe as [Plaintiff] could expect under the circumstances."

concludes, as did the Ninth Circuit in *Folkerson*, that when an employer fails to act to prevent or remedy workplace harassment that it knew or should have known was occurring, it has acquiesced in or ratified the harassing conduct and has itself discriminated against its employees in violation of Title VII. *Folkerson*, 107 F.3d at 756.[12] *See also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir.1998) (adopting a similar rule in a hostile work environment case).

Since Ms. Van Horn consistently documented her client's behavior according to standard company practice, there is no question that SSS was on notice of the client's harassing behavior. SSS had also received a documented report of similar conduct from a coworker about KB. Yet SSS did nothing. Not only did the company ignore the rapid escalation of the client's conduct toward Ms. Van Horn, but it failed to provide her, even on her request, with any kind of self-defense training or guidance on how to best respond to such conduct. In a work setting where the behavior of clients can be unpredictable, the Court finds particularly disturbing that SSS left its employees completely unprepared to handle the possibility of aggressive and sexually hostile behavior.

The Court is equally appalled by the failure of a company as large as SSS to take any steps to address workplace sexual harassment issues more generally. As recently as one year ago, SSS had no policy in place to recognize, confront, or combat

sexual harassment in the workplace. SSS failed to train its management staff to investigate and handle allegations of sexual harassment or to advise its supervisors that its disabled clients were capable of engaging in sexual harassment of employees. This utter failure of SSS to address sexual harassment at the workplace constitutes discrimination under Title VII. *Bosley*, 165 F.3d at 639. When Ms. Van Horn was then forced to defend herself from her client's harassment by slapping him, her resistance was oppositional activity against the discriminatory inaction of SSS.

The only remaining issue, then, is whether her oppositional activity was protected under Title VII. As *Folkerson* and *Cruz* illustrate, the real crux of the matter is whether physical opposition to workplace harassment can ever be "reasonable." It is clear that Title VII does not grant employees license to engage in physical violence in order to protest discrimination. *See Cruz*, 202 F.3d at 566. Unlawful, disruptive, or unreasonable protests against discrimination fall outside the scope of Title VII's protections. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Matima v. Celli*, 228 F.3d 68 (2nd Cir.2000). *See also Kempcke v. Monsanto Co.*, 132 F.3d 442, 445 (8th Cir.1998) (quoting *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 230 (1st Cir.1976)). However, the law is equally clear that an individual who is unlawfully attacked and has no opportunity to seek

---

**12.** The failure of SSS here to prevent or respond to sexual harassment of its employees distinguishes this case from other retaliation cases where employees struck their harassers at the workplace. *See Johnson v. West*, 218 F.3d 725 (7th Cir.2000) (employee slapped harasser she believed lied to investigators); *Ligenza v. Genesis Health Ventures of Massachusetts, Inc.*, 995 F.Supp. 226 (D.Mass.1998) (nurse slapped patient for looking up her

blouse). A further distinction is that in these cases, the plaintiffs did not argue that the physical conduct was itself protected oppositional activity. Instead, they made the more standard argument that the protected activity was the filing of a separate formal or informal complaint about a discriminatory practice and that the employer's claim to have terminated them for prohibited physical violence at the workplace was pretextual.

legal recourse may reasonably act to defend against physical harm. *See* 1 Wayne R. LaFave & Austin W. Scott., Jr., Substantive Criminal Law § 5.7(a) (1986). *See also* Restatement (Second) of Torts §§ 63–66 (recognizing the right to the use of force in self-defense). Therefore, where employees find themselves in such an exigency and act in their own defense, they are not engaging in "unreasonable" oppositional activity. The Court reads *Bosley* to compel essentially the same conclusion—that when an employer's failure to act forces an employee to act in self-defense at the workplace, the employee's defensive conduct is reasonable and the employee cannot be terminated for doing so. *Bosley*, 165 F.3d at 639.

In the vast majority of cases, of course, self-defense will not be a reasonable response to workplace harassment. Where other options are available, as in *Cruz*, an employee might reasonably be expected to oppose workplace harassment without resort to actual physical resistance. In Ms. Van Horn's case, however, the utter failure of SSS to protect her from escalating sexual harassment by her client forced her into a situation where on November 6, 2001, she was the victim of a direct assault. At the time Ms. Van Horn slapped her client (a grown man), he was physically restraining her by squeezing her breast. The Court cannot imagine how Ms. Van Horn could have repelled her client's assault and prevented further harm to her person without some sort of physical resistance.[13] Nor can the Court conclude that the fact that KB was disabled makes Ms. Van Horn's conduct unreasonable. Had KB touched a stranger on the street or a coworker while on the job, they might have responded in the same way.[14] There is no evidence that the slap caused KB to sustain physical or emotional injury requiring treatment of any kind. The Court also notes that Ms. Van Horn acted with professionalism and restraint in her attempts to fend off KB's earlier advances; if SSS can envision how Ms. Van Horn could have otherwise responded to such an attack, it should have responded to her request for training and prepared her to do so. Even after the incident occurred, SSS made no attempt to suggest what Ms. Van Horn might have done differently.[15] Under these circumstances, Ms. Van Horn's slapping her client was reasonable self-defense against harassment and was therefore protected oppositional activity under Title VII.

Because SSS agrees that it fired Ms. Van Horn for protected oppositional activity, that is, for slapping her client, further analysis under a *McDonnell Douglas* balancing test is not necessary. SSS' termination of Ms. Van Horn was retaliation for protected oppositional activity in violation of Title VII and the Iowa Civil Rights Act.

In reaching its conclusion the Court is mindful of the fact that "[Title VII] does not entitle courts to 'sit as super-personnel departments,' second-guessing the wisdom of businesses' personnel decisions." *Hill v. St. Louis Univ.*, 123 F.3d 1114 (8th Cir.1997). SSS is certainly free to main-

---

13. Ms. Van Horn has consistently maintained that the slap was purely a reflexive response to her client's touching her breast. However, the Court's conclusion that her conduct was reasonable self-defense does not depend on whether the slap was reflexive or intentional.

14. KB's mother would agree. She testified at trial that she would probably have slapped KB too if she had been in Ms. Van Horn's place.

15. The only alternative approach that appears in the record is a preventative measure Ms. Van Horn herself thought of after the incident occurred.

tain its "zero-tolerance" policy against punishment of its clients. But it cannot do so without also protecting its workers from unlawful harassment. To allow an employer to ignore clear warning signs and then terminate an employee who resists sexual harassment and assault at the workplace is to deny the employee the basic protection against discrimination which Title VII affords. This the Court is not prepared to do.

### C. Damages

Ms. Van Horn has urged the Court to award compensatory damages against Defendants, including damages for emotional distress under Title VII and the ICRA, and to award her punitive damages for violations of Title VII by SSS. Having found that Ms. Van Horn's termination was retaliatory, the Court now turns to the question of damages and the liability of the Defendants.

### 1. Compensatory Damages

 Compensatory damages may be awarded under 42 U.S.C. § 1981a for a Title VII violation, to include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 2000e–5(g); 42 U.S.C. § 1981a(b). "Actual damages" are compensable under the ICRA; unlike Title VII, compensatory damages are not subject to a statutory cap under the ICRA. Iowa Code §§ 216.15(8); 216.16(5) (2001).

Ms. Van Horn has urged the Court to award compensatory damages that, exclusive of emotional distress damages, total $107,940.66. (Plaintiff's Exhibit 24). The amounts requested by Ms. Van Horn are not challenged by SSS, nor does SSS dispute that Ms. Van Horn has mitigated the damages suffered as a result of her termi-

nation. The compensatory damage figure presented by Ms. Van Horn includes $4,167.00 in lost wages incurred from the time of her firing by SSS until her employment in April 2001 at Lab Core, a total of ten pay periods, including lost wages for paid vacation time and holidays based on an $8.25 hourly rate.

 Front pay is an appropriate substitute for reinstatement, "where reinstatement is not a viable option because of continuing hostility between the plaintiff and the employer ... or because of psychological injuries suffered by the plaintiff as a result of the discrimination." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). The Court finds that reinstatement would not be a feasible or desirable remedy for the harm suffered by Ms. Van Horn and that an award of front pay and lost benefits in the amount she has requested is therefore appropriate.

 The requested damage figure also includes $12,103.62 in compensation for the excess mileage and commuting time costs Ms. Van Horn incurred during 2001 and 2002 as a result of having a longer commute than she did when employed by SSS and for her lost time during the 136–mile commute of approximately two hours and fifteen minutes per day, as well as $91,670.04 for similar costs she will incur in the future, from 2003 to 2007. The requested compensation for mileage was calculated at a rate of $0.365 per mile for a commute of 136 miles per day. The calculations of commuting time compensation were based on an $8.25 hourly rate.

The Court finds that Ms. Van Horn is entitled to $42,924.86 as compensation for the added mileage and commuting costs she has incurred as a result of the retaliatory termination.

Ms. Van Horn has also requested emotional distress damages. An award of compensatory damages for humiliation and emotional suffering is an appropriate remedy under both Title VII and the ICRA. *See Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1272 (8th Cir.1981) (emotional distress damages under Title VII); Iowa Code §§ 216.15(8); 216.16(5) (2001). A plaintiff's own testimony is sufficient to establish humiliation or mental distress. *Williams*, 660 F.2d at 1272. As set forth in the Findings of Fact, Ms. Van Horn suffered emotional distress both as a result of the sexual harassment and assault by KB, and as a result of the continued indifference of SSS in the face of her expressed concerns and the increasingly aggressive conduct of her client. The Court acknowledges that the degree of humiliation, embarrassment, and fear she has suffered appears to have been greater because she had been raped as a child. However, this pre-existing condition does not relieve SSS of liability for her suffering; Defendants must "take the plaintiff as they find her." *See Lockard*, 162 F.3d 1062 (affirming a $200,000 compensatory damage award under Title VII where plaintiff's experience of sexual abuse as a teenager was a pre-existing condition that was aggravated by the harassment she suffered on the job). In light of the emotional pain and suffering experienced by Ms. Van Horn as a result of SSS' ongoing failure to act and the retaliatory termination, the Court finds SSS liable to Ms. Van Horn for her emotional distress in the amount of $15,000.00.

## 2. Punitive Damages

Punitive damages may be awarded against a Title VII defendant who acts "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Court concludes that the failure of SSS and its staff to take seriously the repeated complaints by Ms. Van Horn and her coworkers and to equip her to protect herself from harassing behavior evidences reckless indifference toward her rights under Title VII. *See Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262, 1269 (10th Cir.2000) (holding that malice and reckless indifference "are to be inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints, despite knowledge of serious harassment."). Not only did SSS fail to protect Ms. Van Horn by promptly addressing KB's conduct, but it fired her for defending herself. In its Findings of Fact and in its Findings of Law with regard to the retaliation claim, the Court has already expressed its astonishment at the failure of SSS to establish policies to prevent and address workplace sexual harassment or to provide its staff with any type of training on these issues. This is further evidence of SSS' disregard for the rights of employees. It cannot be excused by the fact that Fred Fridlington, who was directly responsible for firing Ms. Van Horn, apparently believed that the disabilities of SSS clients made it impossible for any inappropriate behavior toward an SSS employee to be considered sexual harassment. SSS had left its workforce without any protection from workplace discrimination and harassment of any sort. *See Harris v. L & L Wings, Inc.*, 132 F.3d 978 (4th Cir.1997) (finding failures to establish a sexual harassment policy was evidence of reckless indifference). The Court's conclusion here is further substantiated by Fred Fridlington's statement at trial that being sexually propositioned or experiencing inappropriate physical touching, even of a sexual nature, is something SSS employees should expect to face as part of their job.

The Court finds these facts to be sufficient evidence of the reckless indifference of SSS toward the rights of Ms. Van Horn and other SSS employees and awards Ms. Van Horn punitive damages in the amount of $20,000.00.

### 3. Individual Liability of Fred Fridlington

 Ms. Van Horn has asserted that Fred Fridlington should be held individually liable under the ICRA as the Executive Director and part owner of SSS and as the superior who ultimately decided that Ms. Van Horn should be fired for physically resisting workplace harassment. The Supreme Court of Iowa has determined that individuals may be held personally liable under the ICRA. *Vivian v. Madison*, 601 N.W.2d 872 (Iowa 1999).[16] Supervisors may be held liable in their individual capacity if they are "in a position to control the company's hiring decisions." *Vivian*, 601 N.W.2d at 876 (citing *Sahai v. Davies*, 557 N.W.2d 898 (Iowa 1997)).

 While the evidence shows that Mr. Fridlington made the ultimate decision to fire Ms. Van Horn, there is no indication in the record that he was personally aware of any of the instances of harassment Ms. Van Horn had experienced from her client prior to November 6, 2000, nor is there sufficient evidence to hold Mr. Fridlington personally responsible for the discriminatory conduct of SSS in failing to maintain and enforce workplace sexual harassment policies or respond to Ms. Van Horn's complaints. The Court believes that Mr. Fridlington's decision to terminate was based on his determination to strictly enforce company policy on punishment of clients and on the misguided assumption that the disabilities of their clients made it impossible for them to engage in conduct

toward an SSS employee that could constitute sexual harassment. Accordingly, the Court finds that while the actions of Mr. Fridlington may be imputed to SSS, Defendant SSS is solely liable for the harm experienced by Ms. Van Horn.

### III. JUDGMENT

It is hereby ordered, adjudged and decreed that judgment is entered in favor of the Plaintiff, Betty Van Horn and against Defendant Specialized Support Services in the amount of $82,091.86. It is further ordered, adjudged and decreed that costs will be calculated by the Clerk of Court and assessed against Defendant Specialized Support Services.

---

**16.** The Eighth Circuit has held that individual liability does not attach under Title VII. *See* *Bales v. Wal–Mart*, 143 F.3d 1103 (8th Cir. 1998).