# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3632

_____

| | | |
|---|---|---|
| Lynda Hunt, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska |
| Nebraska Public Power District, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  October 19, 2001

Filed:  March 11, 2002

_____

Before McMILLIAN, BEAM and MURPHY, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Lynda Hunt brought this sex discrimination action in the United States District Court for the District of Nebraska against her former employer, Nebraska Public Power District (NPPD), alleging violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"); violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); breach of contract; and intentional infliction of emotional distress.  Hunt now appeals from final orders entered in the district court (1) granting NPPD's motion for judgment as a matter of law and dismissing her retaliation claim at the close of her case-in-chief; (2) vacating a jury verdict in favor of Hunt, granting NPPD's motion for judgment as a matter of law, and entering an

amended judgment in favor of NPPD on her equal pay claim; and (3) denying Hunt's post-trial motions to amend judgment to award back pay and prejudgment interest and for attorneys' fees. Hunt v. Nebraska Public Power District, No. 4:99CV3030 (D. Neb. Sept. 27, 2000) (memorandum and order) ("slip op."). For reversal, Hunt argues that the district court erred in (1) holding that she did not establish a prima facie case of retaliation; (2) holding that a reasonable jury could not have found that she performed work substantially equal to that of her former supervisor; and (3) not allowing her to recover back pay under Title VII, prejudgment interest, and attorneys' fees. For the reasons set forth below, we affirm in part, reverse in part, and remand the case to the district court for further proceedings.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal questions), 1343 (civil rights actions). The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 (final decisions of district courts).

## I. Facts

The facts are herein presented in the light most favorable to Hunt, as required on review of a district court's decision to overturn a jury verdict. See Hathaway v. Runyon, 132 F.3d 1214, 1217 (8th Cir. 1997) (Hathaway) (vacating district court's entry of judgment as matter of law and remanding for entry of judgment on jury verdict for plaintiff on sexual harassment claim).

NPPD generates, distributes, and sells electricity. NPPD is organized into regions, each region is divided into districts, and each district has an office that administers the work of NPPD for customers in that district. Hunt worked for NPPD as a clerk in the Plattsmouth district office in the Eastern Region for seventeen years. Clerical duties in the Plattsmouth district office generally included (1) explaining billing procedures, policies, and rates to customers; (2) updating the Customer

Information System and work meter orders; (3) data entry, review, and correction; (4) collecting delinquent accounts; and (5) handling customer payments.

At the time Hunt was hired on October 1, 1979, the Plattsmouth district office consisted of – in order of seniority – one manager, one supervisor, one "general clerk I," one "general clerk II," and a part-time clerk. Bill Lofquest was district office manager when Hunt was hired. Jim Bellows was district supervisor from 1984 until 1987, when he was promoted to regional supervisor. Jerry Craft was district supervisor from 1987 to 1995, when he retired. Dorothy DeBacker was a general clerk from the time Hunt was hired until 1994, when DeBacker retired. Cathy Cundall was a general clerk from 1994 until 1997, when Cundall resigned. Hunt was hired as a part-time clerk, was promoted on March 10, 1980 to full-time general clerk II, and was promoted on December 16, 1985 to general clerk I. There were also other NPPD employees in the Plattsmouth district and the Eastern region, such as meter readers and line technicians, who did not work in the office but interacted regularly with the Plattsmouth district office.

At trial, Bellows testified that he recommended that the district supervisor position remain vacant when Craft announced his retirement because Lofquest was supposed to pick up some of Craft's duties and, in any event, he thought Hunt "was very capable of taking care of things." Acting regional manager Pat Pope said that NPPD was reorganizing, and that as a cost-saving measure, Craft's duties were supposed to be divided and assigned to Lofquest, district superintendent Rocky Matthews, and Hunt.

Hunt testified at trial that, in October 1995, Lofquest promised her that if she took on some of the district supervisor's duties and responsibilities, he would change

her job title and increase her pay.[1]  Hunt testified that she agreed and thereafter began performing many of the functions Craft performed before retirement in addition to her clerical duties.  For example, Hunt testified that, after Craft's retirement, she trained, informally disciplined, and evaluated the performance of other employees.  She testified that Lofquest only filled in the performance appraisals with the information Hunt provided to him.

Other trial witnesses corroborated Hunt's testimony that she assumed more of the supervisory duties after Craft retired than anyone else, including Lofquest.  Jolene Haffke, another clerk in the Plattsmouth office, testified that Hunt trained her, was in charge of the office, and took on all the work Craft had previously done.  Matthews, whose office was in Plattsmouth and who interacted daily with the clerks, testified that he never saw Lofquest performing any of the duties he was supposed to perform as a result of Craft's retirement, and that it was Hunt who assumed the bulk of Craft's job and ran the office until the time she was terminated.  Lead line technician Lonnie Muller, who also interacted daily with the Plattsmouth office, testified that Lofquest was in the office only one or two days a week and that Hunt was basically responsible for running the office and accountable for anything that was not accurate.  Numerous other NPPD employees from outside the Plattsmouth office testified that they turned to Hunt when they needed accurate and efficient information from the Plattsmouth office.  Bellows testified that Hunt was the "go-to" person in the office.

NPPD presented testimony to challenge the evidence that Hunt took on a supervisory role after Craft's retirement.  Hunt conceded on cross-examination that it was Lofquest's responsibility to supervise the clerks (including Hunt) and a meter reader, and it was Lofquest who was expected to complete the performance appraisals.  Hunt also admitted that, after Craft retired, she went to Lofquest when a

_____

[1]On two separate occasions prior to Craft's retirement and Lofquest's alleged promise, Hunt applied unsuccessfully for the position of district supervisor.

customer wished to speak to "the supervisor." Moreover, when Lofquest was out of the office, Matthews was in charge, not Hunt, and Hunt did not have the authority to formally discipline other employees.

With respect to compensation, neither Lofquest, Matthews, nor Hunt received raises or promotions arising out of their new responsibilities, but Lofquest and Matthews were already more senior than Craft when he retired and earned more money than Craft ever did. According to the NPPD chart listing the wages for all NPPD clerks and district office supervisors, when Craft retired he earned $3,138.00 per month ($37,656.00 per year). In contrast, in 1996, after Craft retired and Hunt began performing Craft's duties, Hunt earned $1,739.00 per month as a clerk ($20,868.00 per year). Human resources manager Gary Kruse acknowledged that women at NPPD were concerned about being asked to take on the duties of outgoing male employees but not being compensated for doing so.[2]

Lofquest wrote in Hunt's 1996 performance appraisal that he considered Hunt a real asset to him and to NPPD, noting her role in training the other clerks and citing her "years of experience" and "vast knowledge." Lofquest also commented in that appraisal that Hunt's added responsibilities put quite a strain on her, but that she was handling it very well. Hunt testified that, shortly thereafter, she began complaining about having to do all of the work of a district supervisor without receiving the raise or the promotion she was promised. According to Hunt, when acting regional

---

[2]Relatedly, in 1993, the NPPD Women's Opportunities Task Force issued a 33-page report listing eight barriers to advancement within NPPD for women. Among the barriers described were that (1) women's job roles were stereotyped by cultural attitudes; (2) NPPD had not taken sufficient steps to successfully increase the number of women available for positions traditionally held by men; (3) NPPD supervisory personnel did not make training and career development opportunities available to some clerical female employees; and (4) some NPPD supervisors were reluctant to hire women into traditionally male jobs, thus deterring future advancement of women.

manager Pat Pope reviewed the 1996 appraisal and Hunt's comments about doing extra work without being compensated accordingly, he directed Lofquest in writing to take on more of the duties he was originally assigned after Craft retired, in order to "manage Hunt's workload and expectations."

Hunt testified that when she continued to verbally complain after the situation did not improve, Lofquest and Bellows advised her to put her concerns in writing. On September 18, 1996, Hunt wrote a memorandum requesting help in training Cundall, whom Hunt said was having difficulty performing her job. In the memorandum, Hunt explained that she was frustrated that she needed to devote so much time to training Cundall, that Cundall was being uncooperative and that she was being held accountable for Cundall's mistakes, and that she never received the formal training to handle such situations that a supervisor would receive.[3] Hunt requested either that she be given the pay and training commensurate with a district supervisor, or that she be permitted to return to performing solely the responsibilities of a clerk. In response to Hunt's memorandum, Lofquest and his supervisor, regional manager Ron Hitch, suspended Hunt without pay for one week. Hunt testified that Hitch read aloud to her the suspension memo, did not let her respond, did not address the concerns she raised about the office, and told her to "go home and think about what she'd done." Hunt testified that she was so upset by the suspension that she became physically sick for several days, felt afraid to return to work, and sought counseling that continued throughout the remainder of her employment and thereafter. Hunt returned to work following the suspension and resumed performing all of the same duties as before she was suspended, still without a pay increase or job title change, and still without further supervisory training or managerial assistance.

---

[3]Matthews later testified that he, too, had heard several complaints from other employees and customers about Cundall's job performance.

In February 1997, Lofquest put Hunt on probation for 90 days because of communication problems he alleged Hunt had with Cundall. Cundall was not put on probation. Cundall testified in her deposition that she did not remember complaining about Hunt to anyone at NPPD and that she did not specifically recall having any problems with Hunt.[4]

On March 3, 1997, Cundall gave Lofquest written notice that she was resigning. Lofquest testified that Cundall resigned because of the way Hunt treated her. However, Cundall testified in her deposition that she left NPPD because she was experiencing personal and marital problems that impacted her job performance, she already had a better job lined up elsewhere, and, moreover, she did not remember whether she had ever even discussed Hunt in her exit interview with Hitch and Lofquest on March 14, 1997. Lofquest admitted at trial that a big part of the "communication" problem was that Hunt was held accountable for Cundall's inability to perform her job.

On March 18, 1997, on Hunt's first day back from a previously approved vacation while she was still on probation, Hunt was terminated effective March 27, 1997. Hunt says Hitch read her the termination notice in Lofquest's presence, and suspended her immediately for "serious misconduct and/or grossly inadequate performance." Lofquest told Hunt she was terminated as a result of the

---

[4]This incident apparently was not the first time Hunt had been disciplined for interpersonal and communication problems. In 1987, Hunt and DeBacker were each put on probation for six months for their inability to interact constructively with each other. NPPD also alleges that, in 1995, Hunt was rude to a customer and a fellow employee on the phone, citing her negative tone of voice, coldness, and matter-of-fact attitude. According to the report of the NPPD Grievance Board, however, there was not enough information to determine whether the customer's problem was specific to Hunt or attributable to the frustration customers often experience when they need to call about their power being disconnected.

communication problem with Cundall and for a long history of performance problems.

Hunt appealed her termination to the NPPD Grievance Board ("the grievance board"). After a two-day hearing, the grievance board concluded that the termination would stand because NPPD's policy did not require just cause for an employee to be terminated. However, the grievance board reversed Lofquest's and Hitch's determination that Hunt's actions constituted serious misconduct or grossly inadequate performance, voted to change her 1996 suspension without pay to a suspension with pay, and directed the human resources department to compensate her accordingly. One of the three members of the grievance board, Garrett Smith, said he disagreed with the decision to terminate Hunt, found insufficient evidence to substantiate such an extreme action, and refused to sign the report of the grievance board. Lofquest admitted that NPPD's suggested disciplinary guidelines were not followed in Hunt's case, and testified that he was certain part of the reason she was terminated was because she had complained about not getting extra pay for performing the extra duties and responsibilities of an office supervisor.

## II. Procedural Background

On December 18, 1997, Hunt filed a complaint with the Nebraska Equal Opportunity Commission and the Equal Employment Opportunity Commission (EEOC), charging NPPD with discrimination based on sex. On November 20, 1998, Hunt received a notice of right to sue letter from the EEOC.

Hunt filed the present action against NPPD on January 27, 1999, alleging equal pay claims pursuant to Title VII and the EPA, a retaliation claim pursuant to Title VII, a breach of contract claim, and an intentional infliction of emotional distress tort

claim.[5]   After Hunt presented her case-in-chief, the district court granted NPPD's motion for judgment as a matter of law and dismissed Hunt's claims for retaliation, breach of contract, and intentional infliction of emotional distress.  The district court allowed the equal pay claims pursuant to Title VII and the EPA to go to trial.

At trial, after the district court determined that the prima facie case for an equal pay claim was the same under Title VII and the EPA, the district court submitted to the jury a single instruction on the equal pay claims that did not differentiate between the two.  On June 20, 2000, the jury returned a unanimous verdict for Hunt, found that NPPD's acts regarding the equal pay claims were not done willfully, and awarded Hunt compensatory damages for four months of back pay in the amount of $5,596.00, and $100,000 for emotional distress.[6]

On June 21, 2000, the district court entered judgment on the jury verdict and added taxable costs with interest at the rate of 6.375 percent per annum.  Hunt v. Nebraska Public Power District, No. 4:99CV3030 (D. Neb. June 21, 2000) (judgment).  On the same day, Hunt moved to amend the judgment to correct a perceived miscalculation of back pay because, under Title VII, back pay accrues for up to two years prior to the filing of an EEOC charge regardless of whether there was a willful violation of the EPA.  Hunt argued that she was entitled to $16,788 more in back pay, representing an additional twelve months of pay, as compensation for the period from December 18, 1995 (two years before she filed her EEOC claim) to March 27, 1997 (the date she was terminated).  In the same motion, Hunt also

_____

[5] Hunt also alleged claims under the Nebraska Wage Discrimination Law and the Nebraska Fair Employment Practices Act.  These state law claims are not specifically discussed because they are subsumed within the federal law claims.

[6] The damages for emotional distress arose out of the equal pay claims only, and are not related to Hunt's tort claim for intentional infliction of emotional distress, which was dismissed before the jury received the case.

requested that the district court award her prejudgment interest. On June 26, 2000, Hunt moved for an award of $84,729 in attorneys' fees and $2,507.36 for expenses.

On June 30, 2000, NPPD moved for judgment as a matter of law, seeking to overturn the jury verdict for the reason that there was no legally sufficient evidentiary basis for the conclusion that NPPD violated either Title VII or the EPA or for the jury to award damages for emotional distress. On September 27, 2000, the district court denied Hunt's post-trial motions, vacated the jury verdict, and entered an amended judgment granting NPPD's motion for judgment as a matter of law on all of Hunt's claims for the reason that Hunt's job was not substantially equal to that of her former supervisor. See slip op. at 6. This appeal followed.

## III. Analysis

We review *de novo* the district court's grant of judgment as a matter of law, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party. See Gardner v. Buerger, 82 F.3d 248, 249 (8th Cir. 1996) (Gardner) (reversing district court's judgment as matter of law for defendant in civil rights action and remanding for jury trial).

A. Retaliation Claim

Hunt argues first that the district court erred in dismissing her Title VII retaliation claim as a matter of law at the close of her case-in-chief. Considering the evidence presented in the light most favorable to Hunt, we cannot agree that the district court erred in holding that Hunt did not establish a prima facie case of retaliation.

Title VII prohibits employers from retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination

made unlawful by Title VII ("the opposition clause"), or participating in an investigation under Title VII ("the participation clause"). See Brower v. Runyon, 178 F.3d 1002, 1005 & n.3 (8th Cir. 1999) (affirming summary judgment for defendant because plaintiff failed to establish prima facie case of retaliatory discrimination). To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she was engaged in a protected activity (opposition or participation); (2) she suffered an adverse employment action; and (3) the adverse action occurred because she was engaged in the protected activity. See Coffman v. Tracker Marine, 141 F.3d 1241, 1245 (8th Cir. 1998) (Coffman) (affirming district court's denial of employer's motion for judgment as matter of law). Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defense to produce a nondiscriminatory reason for the adverse employment action. See id. Then, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. See id.

The protected activity in Hunt's retaliation claim would fall generally within the opposition clause, but Hunt failed to present sufficient evidence that she opposed an *unlawful* employment practice prior to her termination. While Hunt complained that she was entitled to a pay increase and a change in job title, she did not attribute NPPD's failure to give her a raise or a promotion to sex discrimination. Thus, Hunt was not engaged in a protected activity for the purposes of Title VII and consequently did not establish a prima facie case of retaliation. Because Hunt did not meet her initial burden, the burden does not shift to NPPD to offer a nondiscriminatory reason for Hunt's termination. We therefore do not reach Hunt's evidence of pretext and need not consider whether or not NPPD actually terminated Hunt for the reasons it offered.

In light of the foregoing, we hold that the district court did not err in dismissing Hunt's retaliation claim as a matter of law because there was insufficient evidence that the adverse employment action was related to sex discrimination.

B. Equal Pay Claims

Hunt next argues that the district court erred in vacating the jury verdict in her favor and granting NPPD's post-trial motion for judgment as a matter of law on Hunt's equal pay claims. We agree. For the reasons explained below, we hold that the district court erred in ruling as a matter of law that no reasonable juror could have found that Hunt's job was substantially equal to that of her former supervisor, Craft.

We begin by recognizing that the law places a high standard on overturning a jury verdict, see Hathaway, 132 F.3d at 1220, because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused. See Gardner, 82 F.3d at 251. Where conflicting inferences reasonably can be drawn from the evidence, it is the role of the jury, not the court, to determine which inference shall be drawn. See Ryther v. Kare 11, 108 F.3d 832, 844 (8th Cir. 1997) (en banc) (affirming judgment of district court for plaintiff in age discrimination action in accordance with jury verdict). Only where "all of the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict" should the grant of a motion for judgment as a matter of law be affirmed. Hathaway, 132 F.3d at 1220. Thus, it is improper to overturn a jury verdict unless, after giving the nonmoving party the benefit of all reasonable inferences and resolving all conflicts in the evidence in the nonmoving party's favor, there still exists *"a complete absence of probative facts* to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." Id. (emphasis added). With this standard in mind, we review whether probative facts existed to support the jury's finding that Hunt was denied equal pay for equal work.

To establish an equal pay claim, a plaintiff must show by a preponderance of the evidence that (1) she was paid less than a male employed in the same establishment, (2) for equal work on jobs requiring equal skill, effort, and responsibility, (3) which were performed under similar working conditions. See

Corning Glassworks v. Brennan, 417 U.S. 188, 195 (1974) (holding that inspection work in question was equal and merited equal pay). The jobs need not be identical to be considered "equal" under the EPA; they need only be substantially equal. See Krenik v. County of Le Sueur, 47 F.3d 953, 961 (8th Cir. 1995). Moreover, neither job classifications nor titles are dispositive for determining whether jobs are equal for purposes of EPA and Title VII. See Orahood v. Bd. of Trustees, 645 F.2d 651, 654 (8th Cir. 1981) ("We look to the actual job requirements and performance, not on-job classifications or titles.").

It is undisputed that Hunt was paid less than Craft. It is further undisputed that Hunt and Craft worked in the same office under similar working conditions. The only element of Hunt's equal pay claims truly in dispute was whether Hunt and Craft performed equal work on jobs requiring equal skill, effort, and responsibility, or in other words, whether their jobs were substantially equal. Whether two jobs are substantially equal "requires a practical judgment on the basis of all the facts and circumstances of a particular case," including factors such as level of experience, training, education, ability, effort, and responsibility. Buettner v. Eastern Arch Coal Sales Co., 216 F.3d 707, 719 (8th Cir. 2000) (Buettner) (affirming grant of summary judgment for defendant in Title VII and Equal Pay action). Two jobs could require "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility" and still be substantially equal. 29 C.F.R. 1620.14(a). The same is true for insubstantial or minor differences in supervisory responsibility. See also Hill v. J.C. Penney Co., 688 F.2d 370, 373-74 (5th Cir. 1982) (affirming district court's holding that defendant violated EPA by paying plaintiff less for equal or greater work based solely on gender, and that defendant's claim that male employee was "supervisor" was not supported by evidence).

NPPD argues that the jobs performed by Hunt and Craft were not substantially equal because Craft performed supervisory responsibilities which Hunt never performed. NPPD maintains that these supervisory duties entailed more than

insubstantial or minor differences in the degree or amount of skill and responsibility involved, and thus justify the difference in compensation.[7]  However, whether a difference in supervisory responsibility is insubstantial and minor, or justifies a pay disparity, requires a factual inquiry into the circumstances of the particular case.  See Buettner, 216 F.3d at 719.

Drawing all reasonable inferences in favor of Hunt, we cannot say that it was unreasonable for the jury to find that the two relevant jobs were substantially equal because Hunt's job after Craft retired entailed equal skill, effort, and responsibility as had been exercised by Craft.  The evidence at trial showed that Hunt was held accountable for the work of other employees, she participated in the evaluation of employees, she trained other employees, and she "basically ran the office."  Viewing the facts presented in the light most favorable to Hunt, including the extent to which Hunt performed supervisory work, we conclude that it was not unreasonable for the

---

[7] NPPD cites Krenik v. County of Le Sueur, 47 F.3d 953 (8th Cir. 1995) (Krenik), for the proposition that differences in supervisory authority preclude Hunt from proving as a matter of law that she and Craft were paid different wages for equal work.  However, this is a very different case from Krenik, where we affirmed the district court's grant of summary judgment because the plaintiff there failed to establish a prima facie case.  The district court in Krenik did not resolve conflicts in the evidence; all of the evidence offered pointed to the conclusion that the jobs in question were unequal.  In Krenik, the district court properly granted summary judgment against the plaintiff because all of the evidence showed that there was a great difference in skill, supervisory responsibility and non-supervisory responsibility.  See Krenik, 47 F.3d at 956 (explaining that additional duties included operating and maintaining boiler and air conditioning equipment, minor electrical and mechanical repair, and supervising plaintiff; that interviews revealed that plaintiff possessed only basic knowledge of mechanical, electrical and plumbing maintenance; and that male employee possessed thorough knowledge of these areas).  There was no factual dispute to resolve.  In marked contrast, here it is the district court's resolution of a factual dispute and a vacated jury verdict, not the district court's legal determination of the existence of a prima facie case, that is at issue today.

jury to find that any difference between Craft's supervisory responsibilities and Hunt's was insubstantial or minor. The resolution of factual disputes is the very function that juries are asked to perform, and it is not within the province of the district court to replace the jury's reasonable findings with its own. See Hathaway, 132 F.3d at 1223 ("In reviewing the sufficiency of the evidence . . . a court must not weigh or evaluate the evidence . . ."). We therefore reverse the district court's granting of judgment as a matter of law and reinstate the jury verdict in favor of Hunt on her equal pay claims.

## C. Hunt's Motion to Amend Judgment and for Attorneys' Fees

Hunt next argues that the district court erred in denying her post-trial motion to amend judgment to award additional back pay and prejudgment interest and her application for attorneys' fees. The district court did not address the merits of these post-trial motions because it granted NPPD's motion for judgment as a matter of law on the equal pay claims. Because the trial court did not address the merits of the post-trial motions, we remand the case to the district court for consideration of Hunt's motion for back pay under Title VII, prejudgment interest, and for attorneys' fees. See Bailey v. Runyon, 167 F.3d 466, 470 (8th Cir. 1999) (remanding for consideration of damages when district court did not address post-trial motion for damages because it granted judgment as matter of law for defendant).

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the district court in part and reverse it in part, and remand the case for further proceedings consistent with this opinion.

BEAM, Circuit Judge, concurring and dissenting.

I concur in the court's affirmance of the district court's dismissal of Ms. Hunt's retaliation claim. However, I respectfully dissent from the court's conclusions regarding the equal pay claim.

In this regard, I agree with the district court that Hunt's and Craft's supervisory responsibilities were substantially different, enough different to defeat the equal pay claim.

Accordingly, I would affirm this case in all respects based upon the well-reasoned opinion of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.