Patricia VAN ORDEN, Plaintiff,

v.

WELLS FARGO HOME MORTGAGE, INC., and Jody Wettach, Defendants.

No. 4:04–cv–00558–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 1, 2006.

Mark D. Sherinian, Sherinian & Walker
PC, West Des Moines, IA, for Plaintiff.

Lora L. McCollom, Gonzalez, Saggio & Harlan, LLP, West Des Moines, IA, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

Before the Court is the motion for summary judgment filed by Defendants Wells Fargo Home Mortgage, Inc. (Wells Fargo), and Jody Wettach (Wettach), which Plaintiff Patricia Van Orden (Van Orden) resists. Van Orden is represented by Mark Sherinian. Defendants are represented by Lora McCollom. The parties have not requested a hearing, and the Court finds oral argument unnecessary. Accordingly, the matter is fully submitted and ready for ruling.

This case ultimately turns on the narrow issue of whether the Plaintiff has generated a prima facie case that she engaged in protected activity by opposing employer discrimination on the basis of race and was then subjected to retaliation for her protected activity. Because Plaintiff seeks to make this showing through reference to the larger circumstances of Plaintiff's employment environment, a broader discussion of the facts will be necessary in this Order.

### SUMMARY OF MATERIAL FACTS[1]

Van Orden began working for Brenton Bank as a mortgage closing specialist in West Des Moines.[2] Van Orden continued to work for Wells Fargo after it acquired Brenton Bank and eventually became a closing supervisor in the mortgage department, where she was supervised by Jody Wettach (Wettach), the Production Operations Manager.

As a supervisor, Van Orden prepared audit reports and managed twelve mortgage loan closers, supervising their daily work, providing performance evaluations, and conducting salary reviews. The employees under Van Orden's supervision were responsible for completing all the documents necessary to close a mortgage loan on a timely basis. A key function of the mortgage department was managing the "rate locks" that stayed the mortgage loan interest rates. A missed lock could lead to an expired rate, and if the rate expired, Wells Fargo could be assessed a penalty of two percent of the cost of the loan. The mortgage loan processors and closers were responsible for insuring the rates of their assigned loans were locked before they left each day. The supervisors, in turn, were responsible for insuring the rates on loans assigned to their subordinates were locked before they left work. To aid in monitoring the rate locks, the supervisors received a report listing the various rates scheduled to expire each day and were to remind their direct reports of pending expirations. A supervisor could usually extend a rate lock that was about to expire.

Van Orden claims the rate lock monitoring process described above was the procedure under normal staffing conditions, which did not exist during late 2003 and early 2004 when the alleged retaliatory actions occurred. According to Van Orden, the mortgage department was understaffed during this time and had temporary team leaders, so if a supervisor left

---

1. In its recitation of facts, the Court is mindful that it is bound to view the facts in the light most favorable to the nonmoving party and to give that party the benefit of any reasonable factual inferences. *See, e.g., Girten v. McRentals, Inc.,* 337 F.3d 979, 983 (8th Cir. 2003).

2. In November 2004, Van Orden moved to South Dakota; however, Van Orden resided in the Southern District of Iowa at all times material to this action.

before the end of the business day, he or she was permitted to transfer rate lock monitoring responsibility to another supervisor.

The rate lock policy provided that employees would be disciplined for missing a rate lock, even if another employee or supervisor later caught and extended the lock. The first time an employee allowed a rate lock to expire, he or she received a written warning and no monthly bonus. A second expiration would lead to termination of employment. In her deposition, Van Orden admitted that it was common knowledge in the department that an employee *could* be terminated for letting a second lock expire, but she said she understood that the termination was not automatic. The "Lock Expiration Policy," as outlined in Wettach's June 1, 2003, e-mail, contains no reference to termination resulting from a second rate lock expiration, although the written disciplinary notice discussed below does indicate that a second expiration *will* result in termination of employment.

In late 2003, Van Orden and Wettach conflicted over Van Orden's job duties. Van Orden experienced stress that she attributed to an overwhelming sense of responsibility brought on by Wettach's ever-changing performance expectations. While Van Orden knew Wettach's expectations for her as to her team, she was also required to assist in training interim team leaders and claims she was not clear as to whom she was supervising in what capacity. Van Orden discussed her frustration with Wettach, who suggested instructive reading materials and company-sponsored writing classes to remedy Van Orden's concerns. The two continued to discuss Van Orden's concerns at least every two weeks.

Also in late 2003, Van Orden wrote herself a warning for letting a rate lock expire. The warning, dated November 25, 2003, listed the corresponding loans and stated that her employment would be terminated if another rate lock expired. Defendants claim Wettach and Van Orden discussed the warning, Wettach signed the warning, and Van Orden understood that her employment would be terminated if she missed another rate lock. Van Orden claims Wettach placed the warning in her shred bin without signing it and told Van Orden, "I'm not going to let you do this." Van Orden claims this effectively nullified the warning.

According to the rate lock policy, employees on written warning did not receive bonuses.[3] Van Orden received a bonus payment of $127.28 on December 15, 2003, which she considers further proof that Wells Fargo did not give any effect to the November 25 warning. Defendants deny that Wettach placed the written warning in the shred bin and assert that the bonus payment corresponded to work performed in the month of October 2003, before the written warning. Later information revealed that the rate locks for which Van Orden received a written warning never actually expired, but at the time she prepared the warning the documentation erroneously showed an expiration.

The November 25 written warning was not mentioned on Van Orden's January 2004 performance review, and she and Wettach did not discuss it again until Van Orden's employment was terminated on February 12, 2004.

Defendants assert that a policy violation prompted Van Orden's employment termination because she missed another rate lock on February 9, 2004. Wettach claims

---

**3.** Employees in Van Orden's department could earn performance incentive bonuses based on productivity and customer service.

Van Orden offered the explanation that she was busy working on another loan and forgot to check the rate lock. Van Orden denies knowledge of any rate lock expiration during that time and further states that she could not have provided a specific excuse because Wettach never told her which loan's rate lock had expired. According to Defendants, Wettach consulted with the employee relations department and determined that Van Orden's prior written warning mandated termination of employment. Van Orden claims Wettach told her she was being fired because Wettach needed to make an example of her.

Van Orden disputes that the missed rate lock was the reason behind her termination and asserts that the disciplinary policy was applied inconsistently. Van Orden alleges that Amelia Ruiz (Ruiz) and Lacey Vongxay (Vongxay) were the closers responsible for the loan in question, yet they were not disciplined when the rate lock allegedly expired. Ruiz stated in her deposition that she had received a prior warning for letting a rate lock expire, and Defendants' response to Interrogatory No. 23, included in Van Orden's appendix, indicates that Vongxay (then Lacey Smith) also received a prior written warning for letting a rate lock expire. Despite these prior warnings, neither woman was fired.

Wettach explained the alleged disparity, stating that Ruiz was not disciplined because she was absent February 12, and Vongxay was not disciplined because she did not realize it was her responsibility to "back up" Ruiz. According to Defendants, J.D. Stegall (Stegall), mortgage specialist, received a written warning regarding the February rate lock expiration.[4] Wettach testified that Stegall's supervisor, Tony Remsing, was not disciplined because he was a temporary employee hired through a staffing agency and could not be subject to discipline from Wells Fargo.

Van Orden claims the inconsistent application of the rate lock policy and her prior positive performance reviews[5] demonstrate that she was fired because she opposed Defendants' discrimination against two African–American employees, Alisa Jones and Stephanie Goods.

### 1. Alisa Jones

Wettach hired Alisa Jones (Jones) to fill a newly-created position called "pre-closer." Her duties included reviewing each mortgage file and ensuring it contained all the necessary information before passing it on to the closers. Jones soon demonstrated performance and attendance problems. Van Orden counseled her as to the performance issues, but Jones received a written warning for arriving to work late and failing to work an eight-hour day. After the written warning, Jones' attendance problem improved.

Defendants claim Van Orden wanted to fire Jones. Van Orden admits wanting to terminate her employment but counters that it was due to pressure from Wettach. Van Orden claims the pressure to fire Jones started in fall 2003 after a payroll error paid Jones a monthly bonus of $37,000 instead of the $1,800 to $2,000 she was actually due. Jones did not report this windfall. When Van Orden and Wettach learned of the error and confronted

---

4. Defendants claim Ruiz, Vongxay, and Ryan Donnelly were all placed on written warning for allowing other rate locks to expire. Additionally, another employee, Misty Lovejoy, missed a rate lock and was only verbally reprimanded. No other employees were fired for missing a rate lock.

5. Van Orden received positive annual performance reviews, the most recent of which (January 2004) was written by Wettach and rated Van Orden's performance at a "4," which means "consistently above all key targets." The January 2004 performance review does not mention the November 2003 written warning.

Jones, Jones claimed she did not realize the payment was erroneous and had spent almost all of the money. Jones received a written warning for a code of ethics violation for failing to report the error. After the code of ethics violation, Jones took a leave of absence under the Family and Medical Leave Act and returned to work just before Van Orden's employment was terminated. Jones was eventually placed on a repayment plan to reimburse Wells Fargo for the bonus overpayment.

In late 2003, Van Orden issued Jones a performance evaluation. Wells Fargo evaluations were completed on a five-point scale, with five indicating the best performance. Van Orden gave Jones an overall rating of two. Van Orden testified in her deposition that one is the worst an employee can get and "two just puts her a little above bad." (Pl.App. 21; Van Orden Dep. 74:12.) However, Van Orden also testified that she thought she gave Jones a positive evaluation because she pointed out areas of strength, weakness, and potential for improvement. Wettach thought Van Orden should have given Jones a more negative review and suggested content changes, none of which Van Orden adopted.

Van Orden also asserts that after the bonus overpayment, Wettach was "gunning" for Jones and excessively monitored her work activities, including checking what e-mail she was reading and monitoring her work hours and lunch breaks. Van Orden does not remember Wettach monitoring other employees in that fashion, but Defendants state that the monitoring was a result of Jones' performance and attendance issues. Wettach testified that it is common to closely watch employees with attendance problems.

In an e-mail to Tracey Manternach (Manternach), a Wells Fargo human resources employee, Jones said she felt harassed. Van Orden claims this harass-ment was race discrimination; however, Defendants claim Jones felt harassed because Wells Fargo wanted her to reimburse the company for the bonus overpayment. Jones eventually filed a race discrimination complaint with the Iowa Civil Rights Commission.

Van Orden testified Wettach treated Jones differently than she treated other employees because of the bonus issue but also partly because Jones is an African–American woman. Van Orden claims Wettach would not have ever spoken to other employees as she spoke to Jones when they discussed the bonus overpayment in the conference room. Therefore, Van Orden claims Jones was racially discriminated against by Wells Fargo, and her opposition to that discrimination led to her own termination.

### 2. Stephanie Goods

Jones had a friendship relationship with Stephanie Goods (Goods), a mortgage processor who worked in the same department. Goods reported to Misty Lovejoy (Lovejoy), but they did not get along. Goods thought Lovejoy "picked on her," did not listen to her, and was a poor communicator. Goods was comfortable confiding in Van Orden and twice spoke with Van Orden when she was very upset about Lovejoy.

During the first meeting, Van Orden listened to Goods and then brought her concerns to Wettach, who later met with Goods. Goods and Lovejoy continued to clash, and on February 12, 2004, Goods again complained to Van Orden that nothing had changed since their first conversation. Goods said Wettach had not talked to Lovejoy about her concerns. According to Van Orden, Goods attributed this inaction to discrimination, saying Wettach was not helping her because "it's the black thing." Goods denies using that phrase.

Goods did not tell Van Orden that Lovejoy was discriminating against her, and Goods testified that her problems with Lovejoy were personality conflicts not based on race.[6]

After this second conversation, Van Orden again told Wettach about Goods' concerns, but this time Van Orden also told Wettach that she wanted to make sure Wettach followed through and helped Goods. Van Orden claims Wettach became agitated and argumentative when she emphasized her concern that Goods needed more help than Wettach was providing. Wettach told Van Orden she had done the right thing by bringing these concerns to her and following the chain of command. Later that day, February 12, Van Orden's employment was terminated.

Van Orden filed a Complaint on October 14, 2004, alleging that she was fired in retaliation for her opposition to discrimination in the workplace, in contravention of 42 U.S.C. § 2000 et seq. and Iowa Code ch. 216.[7] Specifically, Van Orden believes her termination was related to her treatment of Goods and Jones. Defendants deny Van Orden was terminated in retaliation for her opposition to discrimination in the workplace.

Van Orden invokes the federal question jurisdiction of this court pursuant to 28 U.S.C. § 1331, as her first retaliation claim against Wells Fargo arises under the federal Civil Rights Act, 42 U.S.C. § 2000(e) et seq. Van Orden alleges a second claim of retaliation against Wells Fargo and Wettach pursuant to the Iowa Civil Rights Act, which the Court may entertain under its supplemental jurisdiction. 28 U.S.C. § 1367.

Defendants filed a Motion for Summary Judgment on February 14, 2006. Van Orden resisted that motion on March 10, 2006. Defendants filed a reply on March 24, 2006. No party has requested a hearing, and the matter is fully submitted and ready for ruling.

## APPLICABLE LAW AND DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A summary judgment motion should be interpreted by the trial court to dispose of factually unsupported claims and defenses. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, the trial judge is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a

---

**6.** Goods and Van Orden did discuss some issues with management that Goods thought were racially motivated; however, the managers with whom she had a problem were no longer working in the department when Goods returned from maternity leave in March 2002. These problems preceded Wettach's employment in the department.

**7.** Van Orden filed a complaint with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged discriminatory retaliation. The ICRC issued an Administrative Release (Right–to–Sue letter) on August 9, 2004, and the EEOC issued a Notice of Right to Sue on August 20, 2004.

genuine issue for trial. *Id.* However, the Court is bound to view the facts in the light most favorable to the nonmoving party and to give that party the benefit of any reasonable factual inferences. *See, e.g., Girten v. McRentals, Inc.,* 337 F.3d 979, 983 (8th Cir.2003).

The moving party initially must make a showing of the basis for its motion and the portions of the record that support the party's assertion that there is no issue of material fact. *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). When the moving party has carried its initial burden, the nonmoving party must proffer specific facts demonstrating the existence of a genuine issue for trial and may not rely on mere allegations. *Vaughn v. Roadway Express, Inc.,* 164 F.3d 1087, 1089 (8th Cir.1998) (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). The nonmoving party must make a satisfactory showing on every element of its case for which it has the burden of proof at trial. *Wilson v. Sw. Bell Tel. Co.,* 55 F.3d 399, 405 (8th Cir.1995); *see also Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]o survive the defendant's motion, [the plaintiff] need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

■■■ The Eighth Circuit has held that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991)). Motions for summary judgment in employment discrimination cases are to be carefully scrutinized, due to the "inherently factual nature of the inquiry and the factual standards set forth by Congress." *Henderson v. Ford Motor Co.,* 403 F.3d 1026, 1032 (8th Cir.2005) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). However, when there is no dispute of fact and the plaintiff "fail[s] to produce evidence allowing a reasonable inference that [a discriminatory factor] was a determinative factor" in the decision to terminate, then summary judgment is appropriate. *Mayer v. Nextel W. Corp.,* 318 F.3d 803, 810–11 (8th Cir.2003).

## II. RETALIATION[8]

■■■ Title VII prohibits discrimination against an employee who opposes an unlawful employment practice under that title or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing." 42 U.S.C. § 2000e–3(a). Title VII employment discrimination cases are analyzed under the familiar *Price Waterhouse* or *McDonnell Douglas* frameworks, depending on whether direct evidence is introduced. Price *Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (as modified by the Civil Rights Act

---

8. The Iowa Civil Rights Act (ICRA) is modeled after Title VII, so Iowa courts traditionally look to federal case law for interpretive guidance in employment discrimination cases. *Pecenka v. Fareway Stores, Inc.,* 672 N.W.2d 800, 803 (Iowa 2003). Accordingly, the following analysis also applies to Van Orden's ICRA claim, except that individual liability as to Wettach is not available under Title VII. *See Gary v. Long,* 59 F.3d 1391, 1399 (D.C.Cir.1995) ("while a supervisory employee may be joined as a party defendant in a

Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII") *cited with approval in Bales v. Wal–Mart Stores, Inc.,* 143 F.3d 1103, 1111 (8th Cir.1998); *Vivian v. Madison,* 601 N.W.2d 872, 878 (Iowa 1999) ("a supervisory employee is subject to individual liability for unfair employment practices under" the ICRA). Van Orden recognizes this distinction and has asserted her Title VII claim against Wells Fargo alone.

of 1991, 42 U.S.C. § 2000e–2(m)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Van Orden concedes that she is unable to present direct evidence of retaliation, thus the Court analyzes her claims under the three-part *McDonnell Douglas* burden-shifting framework. *See Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006).

■ Under *McDonnell Douglas*, the plaintiff bears the initial burden to establish a prima facie case by preponderance of the evidence. *Id.* at 1119. If successful, the burden next shifts to the defendant to produce a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* at 1119–20. Upon such a showing, the burden finally returns to the plaintiff to demonstrate that the nondiscriminatory reason is actually a pretext for unlawful retaliation. *Id.*

■ "The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent. Accordingly, the shifting of intermediate evidentiary burdens under *McDonnell Douglas* is merely an analytical tool that 'serves to bring the litigants and the court expeditiously and fairly to this ultimate question.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The shifting burdens do not change the ultimate burden of proof, which is always upon the plaintiff. *Id.* at 1119 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

### A. Prima Facie Case of Retaliation

■ There are three elements to a prima facie retaliation case. "The plaintiff must demonstrate that he or she took part in protected conduct, that he or she was subjected to an adverse employment ac-

tion, and that there exists a causal nexus between the protected conduct and the adverse action." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 632 (8th Cir.2005). "The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and '[a] minimal evidentiary showing will satisfy this burden of production.'" *Id.* (citing *Rodgers v. U.S. Bank*, 417 F.3d 845, 850 (8th Cir.2005)). Still, there must be some showing beyond conclusory allegations.

### 1. Protected Conduct by Plaintiff

■ Title VII prohibits retaliation by employers against employees who engage in protected conduct, which includes "either opposing an act of discrimination made unlawful by Title VII ('the opposition clause'), or participating in an investigation under Title VII ('the participation clause')." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir.2002). Van Orden states that her claim falls under the participation clause, but her brief argues the claim under the opposition clause. There is no evidence in the record that a proceeding or investigation under Title VII occurred during the relevant time, so the Court will proceed under the opposition clause.

■ The opposition clause protects an employee against discrimination for opposing an unlawful employment practice. *Gilooly v. Mo. Dep't of Health and Senior Servs.*, 421 F.3d 734, 741–42 (8th Cir.2005). The Eighth Circuit has interpreted this provision more broadly than a literal reading would suggest, finding that protected activity includes more than filing a formal charge of harassment. *Id.* Internal complaints or informal complaints to superiors are also protected activity under Title VII, *Gagnon v. Sprint Corp.*, 284 F.3d 839, 854 n. 4 (8th Cir.2002), *abrogated on other grounds by Desert Palace v. Costa*, 539

U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), as is "expressing a belief that the employer has engaged in discriminatory practices." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir.2000) (reporting supervisor's comment that "women and minorities don't belong in [this] business" was protected act of opposition). Although Title VII protects an employee contesting what he or she reasonably believes to be an unlawful employment practice, it does not "insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999).

█ In addition, a plaintiff need not prove a prima facie case as to the alleged discrimination underlying the act of opposition. "In general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim." *Wallace*, 442 F.3d at 1118; *see also Buettner*, 216 F.3d at 714 ("A finding of unlawful retaliation [ ]is not conditioned on the merits of the underlying discrimination complaint.... A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law"). This is because a retaliation claim "is not based upon [prohibited] discrimination, but instead upon an employer's actions taken to punish an employee who makes a claim of discrimination." *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1036 (8th Cir.2005). Therefore, Van Orden may prevail on her retaliation claim without proving that Defendants actually discriminated against Jones and Goods as long as she reasonably and in good faith believed the conduct she opposed amounted to unlawful discrimination.

The Eighth Circuit addressed this issue in *Hunt v. Nebraska Public Power District*. There, the plaintiff was promised a pay raise and new job title if she assumed some duties of a retiring coworker. *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1024. The plaintiff and other employees assumed extra duties without receiving the promised pay raise or job title; however, the male employees who assumed extra duties were already more senior and more highly compensated than the plaintiff. *Id.* at 1025. In addition, other female employees across the company had expressed concern about being asked to do extra work without a corresponding increase in compensation. *Id.*

The plaintiff made verbal complaints, but the promised benefits were not forthcoming. *Id.* at 1025–26. She was advised to make a written complaint, but when she did, she was suspended without pay for one week. *Id.* at 1026. The plaintiff was later put on probation for communication problems with another employee. *Id.* That employee resigned, and the plaintiff was fired, allegedly for the communication problems and other performance deficiencies. *Id.*

The district court dismissed the plaintiff's retaliation claim at the close of her case-in-chief. *Id.* at 1028. Although the court said her activity was the sort that would usually be protected by the opposition clause, the plaintiff failed to demonstrate that she attributed the failure to give her a raise or promotion to gender discrimination. *Id.* Therefore, she "failed to present sufficient evidence that she opposed an *unlawful* employment practice prior to her termination" and was not engaged in protected activity. *Id.* Because the plaintiff failed to demonstrate a prima facie case, the court of appeals did not consider whether the plaintiff was actually fired for the stated reasons. *Id.* at 1029.

The *Hunt* case is instructive. While Van Orden explains in great detail the ways in which she believes Jones and Goods were treated unfairly, the *Hunt* case demonstrates that the employee's opposition to the employer's conduct must be expressed in a manner that connects it to an employment practice made unlawful by Title VII. It is at this second level the current claim falters.

Van Orden recounts many instances of allegedly unfair or discriminatory treatment of Jones and Goods. She claims Wettach monitored Jones' departure and arrival times, watched her e-mail use, and took bets on when Jones would be fired. Wettach denies anyone took bets as to when Jones would be fired and says she monitored Jones because she had performance and attendance problems. Van Orden admits that the performance issues and bonus check overpayment prompted Wettach's excessive attention to Jones, but she also claims Wettach's treatment of Jones was partially due to Jones' race because Wettach did not treat other employees in a similar manner.

Van Orden places significance on the way Wettach spoke to Jones when she confronted her about the bonus check overpayment. Van Orden thought Wettach should not have spoken to Jones as she did but states only that those statements were along the lines of, "Are you absolutely sure? You're going to be making more money than the CEO if you get that every month." (Van Orden Dep. 78:12–14; Pl.App. 45.) Nothing in these statements mentions race or discrimination, and Van Orden also admits that she was not aware of any other employee who had received such a gross bonus overpayment and failed to report it.[9]

Goods told Van Orden that Wettach did not say anything to Lovejoy to try to resolve their conflict, which Van Orden claims Goods attributed to discrimination, saying, "it's the black thing." Goods denies ever using such a phrase. Goods' deposition testimony reveals the only time she perceived racial discrimination at Wells Fargo was before the events giving rise to this lawsuit. In fact, she said when she came back from maternity leave and Wettach began working in the department, "race wasn't an issue for me after that." (Goods Dep. 29:22; Def.App. 13.) Goods also testified that she never told Lovejoy or Van Orden that she thought her workplace problems were due to racially discriminatory treatment. However, the central issue is not whether Goods complained to Van Orden about mistreatment connected to Goods' race, but whether Van Orden later demonstrated opposition to that form of discrimination.

These disputed accounts of the alleged discriminatory treatment provide great potential distraction into pondering whether Goods and Jones in fact experienced discrimination on the basis of race. However, as previously noted, the merits of those claims are not before the Court today. These accounts are useful to assist Van Orden in demonstrating her good faith,

---

9. Van Orden also claims her belief of discrimination was reasonable and in good faith because Jones thought she was harassed and treated unfairly. In an e-mail sent after Van Orden was fired, Jones told Manternach, the HR employee, that she felt harassed and she knew bets were being taken as to when she would be fired. Jones also filed a race discrimination complaint with the Iowa Civil Rights Commission. Though these incidents may demonstrate Jones' subjective belief that she was discriminated against, the e-mail and complaint occurred after Van Orden was fired. It is difficult to ascertain how the e-mail or complaint contributed to Van Orden's reasonable belief that Jones was being discriminated against at the time she observed Wettach's behavior, or that Van Orden engaged in opposition to discrimination based upon race.

reasonable belief that discrimination occurred, *Wallace*, 442 F.3d at 1118, and the Court must view all facts in the light most favorable to Plaintiff. However, even if the Court assumes Van Orden has demonstrated a question of material fact as to her reasonable belief, it must still determine whether Van Orden generated a fact question as to her "opposition" to what she reasonably perceived as discrimination. *See Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015–16 (10th Cir.2004) (explaining that a retaliation plaintiff is required to demonstrate that he possessed a reasonable good faith belief that the opposed behavior was discriminatory *"when* he engaged in protected opposition.") (emphasis added).

Van Orden claims she engaged in protected acts of opposition because she confronted Wettach regarding her discriminatory treatment of Jones and Goods. As to Jones, Van Orden claims she gave Jones a fair performance review despite Wettach's desire for a more critical review and refused to incorporate Wettach's negative suggestions. She further supported Jones by counseling her on her job duties and performance expectations.

Van Orden claims she opposed discriminatory treatment toward Goods by communicating Goods' complaint of discrimination to Wettach. She specifically notes that she told Wettach she wanted to make sure Wettach treated Goods fairly because she had not done so previously, which agitated Wettach.

▮▮▮ An employer must have "actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation." *Buettner*, 216 F.3d at 715. In addition, "[n]ot every complaint garners its author protection under Title VII." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C.Cir. 2006). To invoke the benefits and protections of Title VII, "the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Id.* (holding that a memo complaining of "embarrassing, humiliating and downright insulting" treatment failed to adequately allege discrimination and thus was not a protected activity).

Similarly, the Seventh Circuit explained that a complaint of being "picked on" without something tying that grievance to a protected class was insufficient to demonstrate protected activity. *Sitar v. Indiana Dep't of Transp.* 344 F.3d 720, 727 (7th Cir.2003).

> Although an employee need not use the magic words "sex" or "gender discrimination" to bring her speech within Title VII's retaliation protections, "she has to at least say something to indicate her [gender] is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Sitar* conceded that she never told Pedigo that sex discrimination was her real problem. That is enough to doom her claim of a retaliatory transfer.

*Id.* at 727–28 (finding that the same employee's termination was retaliatory when, after the transfer, employee filed charges specifically alleging sex discrimination and hostile work environment with employer's affirmative action office).

▮▮▮ Van Orden's actions that allegedly opposed the discriminatory treatment of Jones fail to present a question of fact under the aforementioned standard. It was Van Orden's job to complete a performance evaluation for Jones. Though she and Wettach may have disagreed as to the content of that evaluation, this at most notified Wettach that Van Orden thought she was treating Jones unfairly. There is a total absence of any evidence that race

was ever mentioned in any discussion surrounding the evaluation or any allegation that Wells Fargo routinely under-evaluated minority employees. Van Orden has not generated a question of material fact that she attributed that unfair treatment to racial discrimination. *See Hunt,* 282 F.3d at 1028 (retaliation plaintiff must demonstrate that she attributed the employer's negative action to protected discrimination). Similarly, the Court finds supporting and counseling Jones are not acts in opposition of discrimination because these acts did not communicate to anyone in Wells Fargo's management that Van Orden thought Jones was being unlawfully discriminated against. *Buettner,* 216 F.3d at 715; *see also Drake v. Minn. Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998) ("we do not believe that the spiritual guidance and friendship ... constitutes protected activity"). The Court is unable to find anything in the record upon which a reasonable jury could find that Van Orden took a protected act in opposition to Wettach's alleged discriminatory treatment of Jones.

Van Orden's comments that she did not think Wettach was providing Goods adequate support and that she wanted to make sure Wettach gave Goods the help she needed come closer to what could be considered an act of opposition to unlawful discrimination because these statements directly communicated to Wettach that Van Orden did not think she was treating Goods fairly. However, there is no evidence that Van Orden connected her complaints of unfair treatment to racial discrimination. Goods denies that she used the phrase, "it's the black thing," in reference to the continued inaction from Wettach. Even if the Court gives Van Orden the benefit of this dispute, and assumes that Goods did in fact tell Van Orden her problems with Wettach were racially motivated, there is still no evidence that Van Orden attributed Goods' concerns of racial

discrimination when she reported them to Wettach.

 Van Orden claims it is clear she was communicating to Wettach "that she opposed the discriminatory conduct that she and the African–American employees perceived," but as noted in the *Hunt* case above, simply making a complaint of unfair treatment as to someone who happens to be in a protected class is insufficient without something tying that complaint to unlawful discrimination. *See also Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1010 (8th Cir.2005) (where plaintiff claimed he was fired when he observed that there were no black employees in a particular management position, comments were not sufficient to demonstrate opposition to an unlawful employment practice because plaintiff did not attribute the absence of black manager to racial discrimination); *Genosky v. Minnesota,* 244 F.3d 989, 991–92 (8th Cir.2001) (where female employee complained of unfair treatment but could not remember if she attributed the unfair treatment to gender discrimination, she could not establish opposition to an unlawful employment practice because she did not complain of unlawful discrimination); *Rone v. U.S. Sprint,* 49 Fed.Appx. 659 (8th Cir. 2002) (unpublished per curiam) (where company newsletter stated plaintiff's training program targeted welfare recipients and recovering drug addicts, her complaint of offense did not constitute opposing an act of discrimination even though program was composed entirely of minorities because plaintiff failed to attribute her offense to racial discrimination).

At most on this record, Van Orden reported the complaints of another employee and advocated a different approach to employee management issues. When Defendants' Statement of Undisputed Facts pro-

pounded that Van Orden herself testified in deposition that she thinks she was fired for "supporting" two black employees, Van Orden responded that, yes, that was her subjective belief, but her Complaint alleged that she was fired for opposing discrimination in the workplace. While Van Orden clearly disagreed with the way Wells Fargo treated two African–American employees, the record discloses nothing in Van Orden's communications to the Defendants that would tie her disagreements to racial discrimination. Filing a Complaint and alleging in retrospect that the alleged opposition was based on racial discrimination cannot retroactively insert that vital connection. To constitute the requisite opposition, more is required than a general disagreement about the management approach to these employees.

The only evidence linking Van Orden's employment termination to an act of unlawful discrimination is Van Orden's subjective yet unexpressed belief that Goods and Jones were treated unfairly because they are black. To hold that any time an employee expresses a concern about another employee who happens to be in a protected class, without anything to indicate to the employer that the concern is based on that protected class, would turn almost any casual disagreement with an employer's policy into a federal case. "The wisdom of a company's decision to terminate its employee for what this Court may regard as a frivolous reason is not an issue in a Title VII case." *Stuart v. GMC,* 217 F.3d 621, 637 (8th Cir.2000).

### CONCLUSION

For the aforementioned reasons, the Court finds that Van Orden has failed to demonstrate a genuine issue of material fact as to whether she engaged in protected conduct. While the Court recognizes this is most often a minor burden, this case is the exception in which even that minor burden has not been sustained. Because the Court finds Plaintiff has failed to demonstrate a prima facie case, the Defendants' Motion for Summary Judgment (Clerk's No. 14) must be **granted.**

**IT IS SO ORDERED.**